**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **HAROLD KELLY MURPHY,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **vs.** | * | **CASE NO.: 2:06-cv-618-MEF** |
| | * | |
| **SOUTHERN ENERGY HOMES, INC., et al.,** | * | |
| | * | |
| **Defendants.** | * | |

---

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S**
**MOTION FOR JUDGMENT ON THE PLEADINGS**

Plaintiff Henry Kelly Murphy, by undersigned counsel, files this Memorandum in Opposition to Defendant's Motion for Judgment on the Pleadings.

## INTRODUCTION

The Federal Manufactured Home Construction and Safety Standards Act, 42 U.S.C. § 5401 et. seq., went into effect June 15, 1976 and is commonly referred to as the "HUD Code." In addition, and relevant to this case, are the Manufactured Home Construction and Safety Standards, 24 C.F.R. § 3280, et. seq., (the "Standards") and the Manufactured Home Procedural and Enforcement Regulations, 24 C.F.R. § 3282 et. seq. (the "Regulations").[1]

Plaintiff seeks redress for the alleged failure of Defendant to comply with these provisions. Further, Plaintiff has alleged that Defendant has knowingly chosen to build homes to a known defective optional standard (when other reasonable options existed) under 24 C.F.R. § 3280.504.

---

[1] Collectively, the HUD Code, the Standards and the Regulations shall be referred to as these "provisions" when it is not necessary to specify one.

Under Defendant's argument on preemption, they could choose to build under any of the condensation control options available to them under the Standards, albeit one which they know does not work, and never be sued. This would mean that Defendant can knowingly put a defective product into commerce when other reasonable options not only existed, but existed for the very reason needed to comply with the HUD Code and the consumers would have no recourse against Defendant.

Defendant misconstrues the HUD Code, the HUD Standards, the HUD Regulations and the case law. First, relevant portions of the HUD Code (e.g. the saving clause) states:

> Compliance with any Federal manufactured home construction or safety standard issued under this title does not exempt any person from any liability under common law.

42 USC § 5409 (c). Defendants fail to cite to the language in the waiver itself[2] (the Regulations): "Complying with the provisions of the waiver does not relieve manufacturers of their responsibilities to use construction methods that result in 'durable, livable, and safe housing' as required by 24 CFR 3280.303(b) of the Standards."[3]

Second, Defendant fails to cite 42 USC § 5403(a)(1)(A)(iii) which states these are performance-based standards. The HUD Code is by and large a performance based Code, the Standards provided the manufacturer with options suitable for geographical specific locations (plus a blanket alternative option) and has always required that:

---

necessary to specify one.

[2] In March, 2000, HUD issued a waiver to 24 CFR Part 3280.504(b)1 for homes cited in hot and humid climates which allowed manufacturers to place a vapor retarder on the outside and remove it from the inside a/k/a "living" side of the walls. (See Exhibits 1 and 2). No such vapor retarder was ever required to be placed on the living side under 280.504(b)2 or (b)3 and there always existed a "blanket" alternate option which enabled the manufacturer to build the home in any manner necessary to make it perform.

[3] See Exhibit 2 attached hereto Final Rule dated April 24, 2002, Part IV Housing and Urban Development 24 CFR Part 3280 "Condensation Control for Exterior Walls of Manufactured Homes Sited in Humid and Fringe Climates; Waiver;

> All construction methods shall be in conformance with accepted engineering practices to insure durable, livable and safe housing and shall demonstrate acceptable workmanship reflecting journeyman quality of work of the various trades.[4]

24 CFR 3280.303(b) *Construction*.

If Defendant chooses to utilize option 1 under 24 C.F.R. § 3280.504, even Defendant must admit that if option 1 is not implemented correctly they cannot argue preemption. Indeed, that is what Defendant has been alleged to have done in this and all cases. Defendant's reliance on *Geier* is misplaced in this respect for if in *Geier* Defendant had been sued because the seat belts were not working, preemption would not apply (in fact Defendant was sued merely for *choosing* a seat belt which worked as it should have). If they were sued not for choosing a seat belt but for putting in seat belts that did not work as they should have, even Defendant must admit that preemption is baseless.

Finally, Defendant's reliance on the *Guidroz* decision is also misplaced because on May 17, 2007, the Court granted Plaintiffs' Motion to Amend the Judgment of Dismissal. *See* attached Exhibit 3. Defendant is perverting the intent and purpose of the HUD Code and attempting to confuse this Court.

## A.    PREEMPTION STANDARDS

In general, federal pre-emption of state statues, local ordinances and/or common law claims can occur in three ways: (1) Congress may pass a statute that by its express terms pre-empts state law; (2) Congress may imply that it is pre-empting state law by occupation of an entire field of regulation, so that no room is left for supplementary regulation; or (3) where Congress speaks neither expressly nor impliedly of pre-emption, state law is pre-empted to the extent that it actually conflicts with federal law. Such a conflict occurs when compliance with both state and federal law is

---

Final Rule" at page 20401.

impossible or when state law stands as and impediment to federal purpose. *See English v. General Elec. Co.*, 496 U.S. 72, 110 S. Ct. 2270, 110 L. Ed. 2d 65, 5 I.E.R. Cas. (BNA) 609, 14 O.S.H. Cas. (BNA) 1609, 115 Lab. Cas. (CCH) P56262, 113 Pub. Util. Rep. 4th (PUR) 97 (1990), as quoted in *Choate v. Champion Home Builders Co.*, 222 F. 3d 7888, Prod. Liab. Rep. (CCH) P 15870, 172 A.L.R. Fed. 691 (10th Cir. 2000).

### 1. **Express Preemption**

The HUD Code expressly states:

> Compliance with any Federal manufactured home construction or safety standard issued under this title does not exempt any person from any liability under common law.

42 USC § 5409 (c).  Also, the final waiver itself expressly states:

> Complying with the provisions of the waiver does not relieve manufacturers of their responsibilities to use construction methods that result in 'durable, livable, and safe housing' as required by 24 CFR 3280.303(b) of the Standards.

*See* Exhibit 2 at page 20401; *See also* 24 CFR 3282.402(a) ("Nothing in this subpart or in these regulations shall limit the rights of the purchaser under any contract or applicable law."). Additionally, 24 C.F.R. 3282.11 (c) makes it clear that Plaintiff is entitled to bring his action: "…A State may establish or continue in force consumer protections, such as warranty or warranty performance requirements, which respond to individual consumer complaints …" If Plaintiff's claims were expressly (or impliedly for that matter) pre-empted, none of these sections would have been written.

Plaintiff respectfully suggests that any argument that the claims herein have been expressly preempted is baseless.

---

[4] The placement of a vapor retarder on the living side of the wall in a hot and humid climate such as is present in this

### 2. **Implied Preemption**

The next question which this Court must determine is whether Congress implied that it is pre-empting state law by occupying the entire field of regulation, so that no room is left for supplementary regulation. Is State law pre-empted because it actually conflicts with federal law? Such a conflict occurs when compliance with both state and federal law is impossible or when state law stands as an impediment to federal purpose.

First, Plaintiff is not attempting to hold Defendant to a different State standard but merely alleging that Defendant has violated the HUD Code / Standards and/or Regulations themselves. The question as to whether there is an actual conflict with federal law or if it is impossible to comply with both state and federal law is moot, since that is not being alleged.

Defendant is thus left arguing that being held to have violated these provisions themselves stands as an impediment to a federal purpose – as backwards as that sounds. As shown below, Plaintiff respectfully suggests that nothing in the provisions suggests that a federal mandate is being impeded by this lawsuit and, to the contrary, the federal purpose of ensuring safe and durable housing is being advanced through the provisions contemplated by Congress and HUD listed herein. Stated differently, after reading the entire HUD Code, Regulations and/or Standards, **to argue that a manufacturer can never be sued (which is really what Defendant is saying) is contradictory to these provisions themselves.** The very essence of the HUD Code is a mandate that the home meet certain performance based results (e.g. condensation control such that it not be trapped in walls) and thus the manufacturer is provided with several options (with geographic location a considered issue) to achieve the performance based result. As discussed below, even prior to the waiver only one of

---

case is in direct violation of accepted engineering practices.

the options required a vapor retarder on the living side of the wall (24 CFR § 3280.504(b)(1)), while

three others did not (24 CFR § 3280.504(b)(2) and (b)(3) and 24 CFR § 3282.14; *See also* 24 C.F.R.

§ 3280.10 *Use of alternative construction*.  The waiver simply provided yet another option for the

manufacturer to enable it to deal with the hot and humid climate found in the Gulf Coast.

> **a. The language of the HUD Code demonstrates that Congress did not intend to impliedly occupy the entire field of manufactured housing standards but rather created performance based standards.**

To begin with the standards are performance based.

42 U.S.C. § 5403. Construction and safety standards:

(a) Establishment.

> (1) Authority. The Secretary shall establish, by order, appropriate Federal manufactured home construction and safety standards, each of which—

>> (A) shall—

>>> (i)   be reasonable and practical;

>>> (ii)  meet high standards of protection consistent with the purposes of this <u>title [42 USCS §§ 5401</u>, et seq.]; and

>>> (iii) <u>be performance-based and objectively stated, unless clearly inappropriate</u>.

*Id.* (emphasis supplied).  It has been argued that the words "high standards" mean that each

respective option is equal (exactly why this is supposed to mean that remains unclear).  Nonetheless,

the very next section tells us that these provisions are designed to be, by and large, performance

based "unless clearly inappropriate."  It is clearly inappropriate when the provisions mandate that the

manufacturer has no choice and, in these very limited cases, the Code is prescriptive.  Even then, the

manufacturer has always been equipped with the ability to seek to use any method it wants (even if

they go against prescriptive requirements) as long as it meet or exceeds the standards. *See* 24 CFR § 3282.14. There is nothing in these provisions mandating that these homes be sold in the condition Defendant has chosen nor that they be sold at all, given the known defects as alleged herein.

Nonetheless, a full and honest reading of these provisions demonstrates that the Secretary followed the federal mandate and, by and large in general and specifically with respect to the issues in this case, created a performance based Code with numerous options at the disposal of the manufacturer to insure durable housing.

The Regulations themselves again tell us these are performance based Codes. The definition of the Federal manufactured home construction and safety standard follows: "...a reasonable standard for the construction, design, and performance of a manufactured home which meets the needs of the public including the need for quality, durability and safety." 24 C.F.R. § 3280.2 (emphasis supplied).

Defendant fails to cite 42 U.S.C. § 5403 (g) which states that alternative approaches must be given so that the manufacturer can achieve or exceed the minimum performance based objectives of the Code:

> 42 U.S.C. § 5403 (g) Manufactured housing construction and safety standards. (1) The Federal manufactured home construction and safety standards established by the Secretary under this section shall include preemptive energy conservation standards in accordance with this subsection.
>
>   (2) The energy conservation standards established under this subsection shall be cost-effective energy conservation performance standards designed to ensure the lowest total of construction and operating costs.
>
>   (3) The energy conservation standards established under this subsection shall take into consideration the design and factory construction techniques of manufactured homes and shall provide for alternative practices that result in net estimated energy consumption equal to or less than the specified standards.

7

*Id.* (emphasis supplied). The HUD Code is replete with language that preserves the rights of the homeowner and demonstrates that Congress did not intend to impliedly occupy the entire field: "Nothing in this subpart or in these regulations shall limit the rights of the purchaser under any contract or applicable law." 24 CFR 3282.402(a). Further, 3282.14 Alternative construction of manufactured homes expressly provides:

> (a) Policy. In order to promote the purposes of the Act, the Department will permit the sale or lease of one or more manufactured homes not in compliance with the Standards under circumstances wherein no affirmative action is needed to protect the public interest. The Department encourages innovation and the use of new technology in manufactured homes. Accordingly, HUD will permit manufacturers to utilize new designs or techniques not incompliance with the Standards in cases: (1) Where a manufacturer proposes to utilize construction that would be prohibited by the Standards; (2) Where such construction would provide performance that is equivalent to or superior to that required by the Standards; and (3) Where (i) compliance with the Standards would be unreasonable because of the circumstances of the particular case, or (ii) the alternative construction would be for purposes of research, testing or development of new techniques or designs.

24 CFR § 3282.14 (emphasis supplied); *See also* 24 C.F.R. § 3280.10 Use of alternative construction "Requests for alternative construction can be made…"). This section thus gives the manufacturer yet one more option with which to comply with its mandate of safe and durable housing, as long as they meet or exceed the minimum based performance standards.

Defendant in effect argues that Plaintiff criticizes HUD's design and engineering principals by contending that Defendant is liable under state laws for complying with one of HUD-mandated options. Defendant states that the Plaintiff "…should not be permitted to impose a local tort standard that conflicts with HUD's rule-making authority and elminates federally-approved construction design choices. *See* Defendant's Motion at page 13.

8

Plaintiff seeks to neither criticize HUD's design principals nor establish a conflicting local tort standard. To the contrary, Plaintiff alleges that Defendant is in violation of the very HUD design principals that were established to protect consumers. The language of the HUD Code and the Regulations demonstrate that the manufacturers are left with wide discretion to be able to insure durable, livable and safe housing. 24 C.F.R. 3280.303(b).

### b. Case Law interpreting the HUD Code supports Plaintiff.

In *Bott v. Sterling Homes, Inc. et. al.*, 527 So. 2d 548 (La. 1988), the manufacturer attempted to use the very same argument that Defendant in this case attempts to use. Perhaps not coincidentally, *Bott* involved moisture problems in the walls, among other things. In *Bott,* the Plaintiff complained of manufacturing defects primarily related to the presence of numerous water leaks around the mobile home's top, sidewalls, doors, and windows. *Id.* at 548. At trial, the Court entered judgment against the manufacturer on behalf of the Plaintiff and further indemnified the seller / installer from liability against the manufacturer. In the appeal, the manufacturer: "... urge[d] that once a home is built in accordance with the standards set out in the "Code," then it can *never* be found to be redhibitorily defective." *Id.* at 549. (emphasis in original). The Appellate Court in affirming the Trial Court stated:

> However, as correctly stated by counsel for plaintiff in his appellate brief, this is a very narrow interpretation of *La. R.S. 51:911*-23(F). We find that the correct interpretation of the statute was stated by Mr. Dave Aymonds, an inspector for the State Fire Marshall's office. Aymonds testified that the HUD regulations are regulatory of the end-result or finished product and not the method by which the mobile homes are to be constructed. This is important when considering the fact that the mobile home has severe water damage which is attributable to either water leaks or condensation. Aymonds stated unequivocally that if either of these two conditions are present, it is in itself a violation of the standards. Moreover, Aymond testified that upon inspection of the mobile home, he found it to be in a condition which is substandard under the regulations.

9

Further support that the Federal regulations were properly considered can be found in the testimony of Mr. Dan Baird, an expert in Housing and Urban Development regulations. Baird opined that the water damage to plaintiff's home was most likely due to condensation <u>and that a home manufactured to HUD standards should not condensate.</u>[5]

*Id.* at 549-550. (emphasis supplied).

In the following cases, the courts held that, in general, the National Manufactured Housing Construction and Safety Standards Act of 1074 (42 U.S. C.A. 5504-5426) does not pre-empt state common-law claims.

In *Richard v. Fleetwood Enterprises, Inc,* 4 F. Supp. 2d 650 (E.D. Tex. 1998), the court held that the National Manufactured Housing Construction and Safety Standards Act of 1974 (42 U.S.C.A. 5401 et seq.) does not, in general, pre-empt state causes of action. The court noted that the Act does not explicitly pre-empt state causes of action, and, in fact, the Act provides in 42 U.S.CA. 5409 (c) that compliance with the federal standards does not exempt any person from liability under common law.

In *Shorter v. Champion Home Builders Co.,* 776 F. Supp. 333 (N.D. Ohio 1991), the court held that the National Manufactured Housing Construction and Safety Standards Act of 1974 (42 U.S.C.A. 5401-5426) does not pre-empt most tort claims regarding mobile housing. The court quoted one provision of the Act, 5403 (d), which states that the Act pre-empts the authority of local governments to establish construction or safety standards for manufactured housing. However, the court went on to quote another provision of the Act, 5409 (c), which provides that compliance with the federal standards for mobile homes "does not exempt any person from any liability under common law." The court concluded that these two apparently contradictory standards, when read together, establish that the Act pre-empts state-law standards, but does not pre-empt most state-law

---

[5] This is what Plaintiff is complaining of as well.          10

claims. The court added that nothing in the legislative history suggests that a state-law claim would frustrate the intent of Congress in reducing personal injuries in mobile homes.

In *Choate v. Champion Home Builders Co.*, 222 F.3d 788, Prod. Liab. Rep. (CCH) P15870, 172 A.L.R. Fed. 691 (10th Cir. 2000), the court held that the National Manufactured Housing Construction and Safety Standards Act of 1974 (42 U.S.C.A 5401-5426) does not expressly pre-empt common-law actions, nor does the Act occupy the field of construction and safety of manufactured homes exclusively, so as to impliedly pre-empt all common-law actions. The court noted that the Act contained, in 42 U.S.CA 5403 (d), an express pre-emption provision that could be read, standing alone, as pre-empting common -law tort actions. The Court also noted however, that the Act contained, in 42 U.S.C.A 5409 (c), a saving clause, which provides that compliance with federal standards does not exempt any person form liability under common law. The court observed that the United States Supreme Court had considered the effect of almost identical pre-emption and saving clause provision in another statute in *Geier v. American Honda Motor Co., Inc.*, 529 U.S 861, 120 S Ct.1913, 146 L. Ed 2d 914, Prod. Liab. Rep. (CCH) P 19795 (2000). The Supreme Court's resolution of these two provisions, the instant court stated, was that the pre-emption clause was meant expressly to pre-empt only state statues and regulations, not common-law actions. The court added that a saving clause does not, by itself, foreclose an implied pre-emption argument but that it was not applicable in the instant case.

In *Turner v. PFS Corp.*, 674 So. 2d 60, Prod. Liab. Rep. (CCH) P 14439 (Ala. 1995), reh'g denied, (Feb 16, 1996), the court held that the National Manufactured Housing Construction and Safety Standards Act of 1974 (42 U.S.C.S 5401-5426), and regulations adopted under it, did not pre-empt state law tort claims at issue, because those claims asserted a failure to comply with federal

standards themselves.[6] The court quoted the holdings of *Shorter v. Champion Home Builders Co.,* 776 F. Supp. 333 (N.D. Ohio 1991), that the Act pre-empts state law standards, but does not pre-empt most state law claims. The court declared that enforcing the federal standards through state tort law does not frustrate federal supervision of the manufactured housing industry, and only claims that impose different state standards are pre-empted. *See also Gackler Land Co. v. Yankee Springs Township*, 138 Mich App 1, 359 NW2d (1984) 226, aff'd (1986), 427 Mich 562, 398 NW2d 393 (Township zoning ordinance, regulating placement of mobile homes, was not preempted by National Manufactured Housing Construction and Safety Standards Act which was designed to provide for minimum construction for safety purposes).

The import of the *Turner*, *Shorter*, *Choate*, and *Richard* cases demonstrate the following points: 1) That claims asserted by Plaintiff in the present case are not preempted; 2) Congress and HUD have not expressly or impliedly preempted that field so as to preclude state law claims for the defects asserted in this action; and 3) that the type of claims asserted by Plaintiff herein are expressly preserved by 3282.11 (c).

> **c.  The HUD Code, Standards and Regulations contemplate that it is the duty of the manufacturer to select one of several options to which to build homes such that they meet the performance based objective of controlling condensation within wall cavities.**

Congress did not intend to occupy the entire field impliedly as Defendant argues. To the contrary, options were left to the discretion of the manufacturer so that the performance based objectives could be obtained. Congress contemplated, because it was necessary, that certain prescriptive standards would not be appropriate in certain geographic locations. The HUD Code states that:

---

[6] Again, this is what Plaintiff argues in this case.

... in recommending standards, regulations, and interpretations, and...in establishing standards or regulations or issuing interpretations under this section, [you] shall-- (3) consider whether <u>any such proposed standard is reasonable for the particular type of manufactured home or for the geographic region for which it is prescribed;</u>

42 U.S.C. § 5403(e) (emphasis supplied).

It is the responsibility of the manufacturer to choose from any one of a number of options to achieve the performance based objective, taking into account, among other things, geographic location. For example, 24. C.F.R. § 3280.504 Condensation control and installation of vapor retarders states:

(1) In Uo Value Zones 2 and 3, ceilings shall have a vapor retarder with a permanence of not greater than 1 perm (as measured by ASTM E-96-93 Standard Test Methods for Water Vapor Transmission of Materials) installed on the living space side of the roof cavity.

(2) <u>For manufactured homes designed for Uo Value Zone 1, the vapor retarder may be omitted.</u>

24. C.F.R. § 3280.504 (a) (emphasis supplied).[7] Zone 1 includes Texas, Louisiana, Mississippi, Alabama, Georgia, South Carolina and Florida. *See* attached Exhibit 3 § 3280.506 U/O Value Zone Map. While a manufacturer might be able to argue preemption for failing to place a ceiling vapor barrier in Zones 2 or 3 since there is arguably no choice,[8] it cannot argue that the HUD Code / Regulations required that they had to do so in Zone 1. Similarly, there is nothing precluding (nor mandating for that matter) the manufacturer from placing a ceiling vapor retarder in Zone 1 but if they choose to do so, they must insure that the home will perform, be durable and safe and not condensate. If they choose to do so in Zone 1 they cannot claim preemption since they were given

---

[7] The newest version of this section deletes paragraph 2 but the prescriptive requirement for Zones 2 and 3 remain and, as was the case previously, Zone 1 does not have the same prescriptive requirement.

[8] Again, the Code gives the manufacturer the option to use any alternate method to insure the home performs and is durable even when the Code appears to be prescriptive. Even in such allegedly prescriptive cases it would defy logic for

options with a mandate to insure that the home perform and be durable and safe and not condensate. This is just one example of why the Code is by and large performance based.[9]

The very next section of the Regulations (one of the sections at issue in this case) has similar options:

> (1) Exterior walls shall have a vapor barrier not greater than 1 perm[10] (dry cup method) installed on the living space side of the wall, **or**
>
> (2) Unventilated wall cavities shall have an external covering and/or sheathing which forms the pressure envelope. The covering and/or sheathing shall have a combined permeance of not less than 5.0 perms. In the absence of test data, combined permeance may be computed using the formula: $PTotal=(1/[(1/P1)+(1/P2)])$ where P1 and P2 are the permeance values of the exterior covering and sheathing in perms. Formed exterior siding applied in sections with joints not caulked or sealed shall not be considered to restrict water vapor transmission, **or**
>
> (3) Wall cavities shall be constructed so that ventilation is provided to dissipate any condensation occurring in these cavities.

24. C.F.R. § 3280.504(b) (emphasis supplied).

It is important to ask what is being required by section 3280.504(b). Is the requirement that a vapor barrier must be installed on the living side of the wall in Zone 1, or is it that the home achieve or exceed the performance based standard of condensation control to insure a durable home? Section 3280.504(b)(2) does not require a vapor retarder. Section 3280.504(b)(3) does not require a vapor retarder but merely that "… ventilation is provided to dissipate any condensation occurring in these cavities." Thus, two-thirds of the options that existed prior to the "waiver" being "implemented" did not require a vapor retarder on the living side. There exists yet another section even prior to the waiver found in 24 CFR § 3282.14 which allows "…new designs or techniques not incompliance

---

a manufacturer to continue to build to a prescriptive standard if it knew the home would not perform.

[9] There are numerous examples of differing options for differing geographical regions in the Standards. *See e.g.* 24 CFR § 3280.305(c) Wind, snow, and roof loads (differentiating again between Zone I and Zones II and III); 24 CFR § 3280.306 Windstorm Protection (differentiating again between Zone I and Zones II and III).

with the Standards… in cases…[w]here such construction would provide performance that is equivalent to or superior to that required by the Standards;[11] and…where compliance with the Standards would be unreasonable because of the circumstances of the particular case." *Id.* This provides the manufacturer with the ability to make the house perform which is a mandated responsibility to insure durable and safe housing. There is simply nothing in this section, or anywhere in these provisions, which required that Defendant do what they have been alleged to know would result in defective housing by placing a vapor barrier on the living side of the home in the hot and humid Gulf Coast region. Doing so (Plaintiff alleges) insures that moisture will be trapped in the walls which is directly contradictory to the long ago established mandate of insuring that the home be durable.[12]

The now fifth option, the waiver, does not require that the vapor retarder be placed on the living side of the walls either. Thus, four-fifths of the options now available to the manufacturer do not require what the manufacturer implies is a federally mandated choice. The title of § 3280.504 is "Condensation control and installation of vapor retarders" and only one of the many options actually requires a vapor retarder on the living side. The performance based objective is controlling condensation and to suggest the manufacturer innocently complied with a HUD mandate by choosing one option over others is disingenuous.

Defendant is also alleged to have violated 24 C.F.R. § 3280.103(b)(3) which states, *inter alia*: "The ventilation system or provisions shall not create a positive pressure in Uo value Zones 2

---

[10] The lower the perm, the less permeable the material.

[11] This section again highlights that these are minimum requirements and that the manufacturer may use alternative approaches that meet or exceed them.

[12] Plaintiff also believes that Defendant knew this and yet continued to profit from this region at the expense of the homeowner.

and 3 or a negative pressure condition in Uo value Zone 1."[13]  One of the many reasons you do not want a "negative air pressure" in Zone 1 (Alabama among others) is that you do not want to suck the hot, moist air into the home (which would then be trapped if you placed a vapor barrier on the living side as is alleged to have occurred here).  This is yet another example of the geographic location being an important consideration for the manufacturer.  Defendant could just as easily argue that since they built their homes to one of the standards (Zone 2 or 3), they cannot be sued but this would highlight the absurdity of their argument.

Section 3280.504(b) provides options by use of the word "or" and requires the manufacturer to choose one of these options so that the home will obtain a performance level of durable, safe housing.  The goal is to dissipate any condensation occurring in these cavities as stated in these subsections.  HUD recognized that in humid and fringe climate areas, the manufacturer would need options to achieve the performance based objective of the Code and that, indeed, some construction techniques could be detrimental to this goal.  Each option is thus not equal as Defendant urges. Publishing the alternatives provided manufacturers with an alternative that a manufacturer can use in the design and construction of manufactured homes that may be compatible with their construction techniques

It is important to note that four options were available to the manufacturer before the "waiver" was implemented in March 2000.  The waiver now creates yet another option from which the manufacturer may choose to meet "their responsibilities to use construction methods that result in 'durable, livable, and safe housing' as required by 24 CFR 3280.303(b) of the Standards."  *See* Exhibit 2 at page 20401.

---

[13]  Again, Zone 1 includes Texas, Louisiana, Mississippi, Alabama, Georgia, South Carolina and Florida. *See* attached

### d. *Geier v. Honda* is inapposite.

*Geier v. American Honda Motor Co., Inc.*, 529 U.S. 861 (2000) involved a lawsuit by an individual who claimed that Honda should have provided an air bag as opposed to just a seat belt. The Department of Transportation ("DOT") not only concluded that the seat belt / air bag options were each equally as good but actually disfavored a mandatory air bag requirement for all cars in 1987 because, among other reasons, they wanted to foster an environment in which States were encouraged to pass seat belt laws. DOT thought seat belts were actually as safe as air bags (and certainly cheaper) *if* people actually used the seat belts.[14]

DOT actually stated that lawsuits such as that being brought by *Geier* defeated this purpose e.g. was impliedly preempted.[15] A portion of the case in G*eier* states:

> Without the saving clause, a broad reading of the express pre-emption provision arguably might pre-empt those actions, for, as we have just mentioned, it is possible to read the pre-emption provision, standing alone, as applying to standards imposed in common-law tort actions, as well as standards contained in state legislation or regulations. And if so, it would pre-empt all nonidentical state standards established in tort actions covering the same aspect of performance as an applicable federal standard, even if the federal standard merely established a minimum standard. On that broad reading of the pre-emption clause little, if any, potential "liability at common law" would remain. And few, if any, state tort actions would remain for the saving clause to save.

G*eier* at page 868. First, the entire premise of such a broad reading of a pre-emption clause is stated in the first sentence: "[w]ithout the saving clause, a broad reading of the express pre-emption provision arguably might pre-empt those actions…" *Id.* (emphasis supplied). As shown however, the

---

Exhibit 3 § 3280.506 U/O Value Zone Map.

[14] "DOT believed that ordinary manual lap and shoulder belts would produce about the same amount of safety as passive restraints, and at significantly lower costs -- *if only auto occupants would buckle up*." *Geier* at page 880.

[15] "We place some weight upon DOT's interpretation of FMVSS 208's objectives and its conclusion, as set forth in the Government's brief, that a tort suit such as this one would "'stand as an obstacle to the accomplishment and execution'" of those objectives" page 883.

HUD Code has a "saving clause" and thus the premise is inapposite. Further, the very next portion of this quote is necessary to understand its meaning:

> We have found no convincing indication that Congress wanted to pre-empt, not only state statutes and regulations, but also common-law tort actions, in such circumstances. Hence the broad reading cannot be correct. The language of the pre-emption provision permits a narrow reading that excludes common-law actions. Given the presence of the saving clause, we conclude that the pre-emption clause must be so read.

*Geier* at page 868. The Court thus concludes: "We have just said that the saving clause *at least* removes tort actions from the scope of the express pre-emption clause. Does it do more?" *Geier* at page 868.

Determining this answer requires an in-depth analysis into the DOT and the policy applicable to seat belts v. air bags, their safety and their respective costs. As such, any comparison to the instant case at this point is meaningless since the DOT standards and HUD standards are obviously entirely different. There are numerous cases interpreting the HUD standards (set forth above) and none stands for the proposition that the claims brought herein are preempted.

The Supreme Court in *Geier*, in a 5-4 decision with a dissent which approximates the length of the majority opinion, ultimately concludes that the plaintiff's common law claims:

> ...would have required all manufacturers to have installed airbags in respect to the entire District-of-Columbia-related portion of their 1987 new car fleet, even though FMVSS 208 at that time required only that 10% of a manufacturer's nationwide fleet be equipped with any passive restraint device at all. It thereby also would have stood as an obstacle to the gradual passive restraint phase-in that the federal regulation deliberately imposed. In addition, it could have made less likely the adoption of a state mandatory buckle-up law. Because the rule of law for which petitioners contend would have stood "as an obstacle to the accomplishment and execution of " the important means-related federal objectives that we have just discussed, it is pre-empted.

*Geier* at page 881.

In the case at hand, HUD has specifically stated that these are performance standards and that they recognize that different parts of the Country require different options for the manufacturer. All options are not equally as good as were found in *Geier* and indeed the options for geographical location were created to ensure that the manufacturers comply with their mandate to insure durable safe housing. As shown, the HUD code is for the most part a performance based standard and the alternatives and the "waiver" were promulgated to permit a range of design options that can satisfy the goals of durable and safe housing. HUD recognized that in humid and fringe climate areas some construction techniques could be detrimental and thus, publishing the alternatives provided manufacturers with an alternative that they could use in the design and construction of manufactured homes that may be compatible with their construction techniques.

Indeed, to make *Geier* more akin to the case at hand, the facts in *Geier* would have to be changed such that, by way of hypothetical, Honda *knew* that the seat belts they were installing were disintegrating in the Gulf Coast Region because they failed to comply with other federal regulations requiring, for example, that in the Gulf Coast they need to ensure that hot, moist air does not infiltrate parts of the seat belts. Under this hypothetical, Defendant would not be sued merely for choosing to use an option provided to them – here the seat-belt versus the air bag – but rather for the fact that the they did not correctly implement the seat belt choice by failing to comply with other relevant federal regulations. While this hypothetical sounds absurd that is really what is happening in this case. Defendant has chosen to utilize option 1 by locating a vapor barrier on the living side of the walls. The exercise of this choice and the mere fact that it is one option given to them does not mean they can simply fail to comply with other relevant federal regulations to make this choice (and thus the home) perform.

In essence, Defendant's argument is that because they complied with *one* of the three options under 24 C.F.R. § 3280.504(b) relating to the location and/or use of a vapor barrier on the interior walls of the home, they cannot be sued.[16]

Such an argument, Plaintiff respectfully submits, is without merit and over-simplifies Plaintiff's claims. For example, Plaintiff's argument is not necessarily that Defendant is liable simply because they chose option 1 under § 3280.504(b) by placing the vapor barrier on the inside (living side) of the walls. Rather, Plaintiff's argument is that if they choose to utilize option 1, they still must ensure the home performs which is a federal mandate e.g. they must ensure "durable, livable, and safe housing" and comply with "accepted engineering practices." 24 CFR 3280.303(b).

For example, if a Defendant chooses option 1, it must still comply with 24 C.F.R. § 3280.103(b)(3) which states, *inter alia*: "The ventilation system or provisions shall not create a positive pressure in Uo value Zones 2 and 3 *or a negative pressure condition in Uo value Zone 1*."[17] One of the many reasons you do not want a "negative air pressure" in Zone 1 (Alabama among others) is that you do not want to suck the hot, moist air into the home (which would then be trapped if you placed a vapor barrier on the living side as is alleged to have occurred here). By way of further example, if a Defendant chooses option 1, it must still comply with 24 C.F.R. §3280.505 which states: 'The opaque envelope shall be designed and constructed to limit air infiltration to the living area of the home. *Any* design, material, method or combination thereof which accomplishes this goal may be used." *Id.* (emphasis supplied).

---

16 The first option requires a vapor barrier on the "living side" but option to 2 and 3 do not and never have.
17 Zone 1 includes Texas, Louisiana, Mississippi, Alabama, Georgia, South Carolina and Florida. *See* attached Exhibit 3 § 3280.506 U/O Value Zone Map.

**e. Defendant's argument on preemption defies logic.**

Under Defendant's argument on preemption, they could still to this day choose to build homes with the vapor retarder on the living side in the hot, humid climate of the Gulf Coast with impunity since they chose one of the options available to them under 24 C.F.R. § 3280.504(b), albeit the one which they know does not work. Under their theory of preemption they will continue to choose the (b)(1) vinyl option and never be sued since, they used one of condensation control options from which manufacturers are required to choose. This would mean that they can knowingly put a defective product into commerce when other reasonable options not only existed but existed for the very reasons needed to comply with the HUD Code: "All construction methods shall be in conformance with accepted engineering practices to insure durable, livable and safe housing and shall demonstrate acceptable workmanship reflecting journeyman quality of work of the various trades."24 CFR 3280.303(b) *Construction*. This theory leaves homeowners like Plaintiff,[18] who has a twenty-year (20) mortgage without any recourse when his home is already deteriorating.[19] The HUD requirements do not preclude (in fact expressly permit) building to (b)(2), (b)(3) or to an alternate standard that meets or exceeds the Codes (not to mention the waiver).

The waiver itself tells us that it cannot be relied upon for this type of preemption argument even if it is complied with: "Complying with the provisions of the waiver does not relieve

---

[18]   Specifically, Plaintiff has a 20 year mortgage, amount financed $40,000.00, a variable APR of 6.366%, and monthly payments $331.87.

[19]   The HUD Code already acknowledges this need: "The Secretary shall develop a new standard for hardboard panel siding…taking into account durability, longevity, consumer's costs for maintenance… The new performance standard developed shall ensure the durability of hardboard sidings for at least a normal life of a mortgage with minimum maintenance required.  42 U.S.C. § 5403 (h) (emphasis supplied).

manufacturers of their responsibilities to use construction methods that result in 'durable, livable,

and safe housing' as required by 24 CFR 3280.303(b) of the Standards."[20]

### f. The *Guidroz* decision.

Recently, in *Guidroz v. Champion Enterprises, Inc., et. al.*, Civil Action No. 05-1148 L-O,

(Federal Court La.) the U.S. Magistrate found that preemption defeated the Plaintiffs claims *as*

*framed* in the original complaint.  Nonetheless, and of particular significance, the Court made the

following exchange with Defense counsel:

| | |
|---|---|
| THE COURT: | Well, you're asking me to hold that his – that his complaint as pled is preempted. |
| MR. DOMINGUE: | That's correct, Your Honor. |
| THE COURT: | And what I hear you saying is that it is conceivable *if he had pled made his complaint read in another way, that it might not be preempted.* |
| MR. DOMINGUE: | *Precisely.*  And let me offer this, Your Honor. |
| THE COURT: | In that case is the remedy to allow him to amend? |
| MR. DOMINGUE: | It could be.  Look, I agree with Your Honor.  There are remedies that's perfectly permissible if this Court chooses.  In fact, I think there's probably case law out there that say, look -- |
| THE COURT: | Well, the case law says if he can amend it, he can solve the Problem (unintelligible). |
| MR. DOMINGUE: | Exactly…. |

(Transcript of Proceedings, entered 8/18/2006, at page 56, lines 2-18) (emphasis supplied).

Plaintiffs filed a Motion to Amend Judgment of Dismissal and for Leave to Amend Original

Complaint.  The proposed amended complaint in *Guidroz*, properly frames a claim which is not

preempted even under Judge Hill's reasoning which Plaintiff respectfully suggest was not in accord

with Supreme Court's "heavy presumption against federal preemption."[21]  Even under Judge Hill's

---

[20] *See* Exhibit 2 attached hereto Final Rule dated April 24, 2002, Part IV Housing and Urban Development 24 CFR Part 3280 "Condensation Control for Exterior Walls of Manufactured Homes Sited in Humid and Fringe Climates; Waiver; Final Rule" at page 20401.

21  There is a heavy presumption against federal preemption of common-law tort claims.  *Medtronic v. Lohr*, 518

reasoning, it is clear that Plaintiffs can seek to hold Defendants liable under the following argument which is outlined in Plaintiffs' proposed amended complaint:

> If a manufacturer chooses to utilize option 1 of 24 CFR 3280.504(b) and place a vapor barrier on the 'living side' of the exterior walls, it still has a duty to take steps to ensure that option 1 is implemented correctly by ensuring the home performs in the manner prescribed in, among other things, sections 3280.103(b) (ventilation system 'shall not create a negative air pressure...) 504 ('Condensation control and installation of vapor retarders') 505 ('The opaque envelope shall be designed and constructed to limit air infiltration to the living area of the home. Any design, material, method or combination thereof which accomplishes this goal may be used') and/or 303(b) (All construction methods shall be in conformance with accepted engineering practices...').

*Guidroz* amended complaint at ¶ 9 pending before Judge Hill. (See Exhibit 5)

Clearly, Judge Hill agreed that a properly framed complaint could not be preempted because on May 17, he Granted Plaintiffs' Motion to Amend his previous judgment by allowing the Amended Complaint to be filed. Importantly, Defendants in its Opposition to *Guidroz* Motion to Amend argued extensively that even under the Amended Complaint, the claims were preempted. *See* attached Exhibit 6 at pages 13-18. Although he granted Defendants an opportunity to re-file a new motion, it is clear that if Judge Hill truly believed that the Complaint *as Amended* was still preempted he would not waste the time allowing the amendment.

Plaintiff's complaint in this case has always maintained that Defendant has failed to comply with other federal regulations like not creating a negative air pressure as discussed extensively herein. Defendant has attempted to set up a straw man and then knock it over to demonstrate that they are right by misstating Plaintiff's arguments. Defendant should not be allowed to avoid the federal mandate that the homes which they build must perform as ultimately the HUD Code is all about performance.

---

U.S. 470, 485 (1996); *Bates v. Dow Agrosciences*, 544 U.S. 431, 449 (2005). This presumption is particularly strong when a defense of implied conflict preemption is raised. Indeed, the U.S. Supreme Court has instructed that

## CONCLUSION

There is simply no basis to argue express or implied preemption. Defendant is perverting the language as well as the intent and purpose of this performance based Code. Plaintiff respectfully requests that Defendant's Motion for Judgment on the Pleadings be denied and that this Court grant such other relief as is just.

/s/ C. Lance Gould_____
C. LANCE GOULD (ASB-0913-G66C)
Attorney for Plaintiff

**OF COUNSEL:**

**BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.**
Attorneys at Law
Post Office Box 4160
Montgomery, AL 36103-4160
(334) 269-2343
(334) 954-7555 (fax)

implied conflict preemption may only be found where there is an "actual conflict" with federal law.

24

## CERTIFICATE OF SERVICE

I hereby certify that I have served the foregoing document upon all Counsel of record <u>as listed below</u> by placing a copy of same in the United States Mail, first class, postage prepaid on this the 24th day of May, 2007.


/s/ C. Lance Gould
OF COUNSEL


W. Scott Simpson
RITCHEY & SIMPSON, PLLC
3288 Morgan Drive, Suite 100
Birmingham, Alabama 35216
Telephone: (205) 822-3422
Facsimile: (205) 822-3618
e-mail: wssimpson@bellsouth.net

Lee E. Bains, Jr.
Thomas W. Thagard, III
Edward S. Sledge IV
MAYNARD, COOPER & GALE, P.C.
1901 Sixth Avenue North
2400 AmSouth/Harbert Plaza
Birmingham, AL 35203
(205) 254-1000 (Telephone)
(205) 254-1999 (Facsimile)
lbains@maynardcooper.com
tthagard@maynardcooper.com
sledge@maynardcooper.com