# EXHIBIT "D"

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

HAROLD KELLY MURPHY,       \*

                           \*

     Plaintiff,           \*

                           \*

v.                         \*     Case No. 4:04cv295GHD-EMB

                           \*

SOUTHERN ENERGY HOMES, INC.,   \*

                           \*

     Defendant.         \*

### PLAINTIFF'S RESPONSES TO DEFENDANT SOUTHERN ENERGY HOMES, INC.'S FIRST SET OF INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS

Plaintiff hereby responds to Defendant's First Set of Interrogatories as follows:

### General Objections

1. The objections to the pending discovery made by Plaintiff are made without waiver of, or prejudice to, additional objections that Plaintiff may make. All such objections are hereby expressly preserved, as is the right to move for a protective order. Plaintiff also reserves all objections to the admissibility at trial of any information provided.

2. Plaintiff objects to the discovery to the extent each request for production and request for admission has absolutely no relevance to the proceedings before the Court and is not calculated to lead to the discovery of admissible evidence.

3. The supplying of any information does not constitute an admission by Plaintiff that such information is relevant in this action. All information provided by Plaintiff is for use in this litigation only; that is, to be used for no other purpose.

4.     Plaintiff objects to each and every discovery request to the extent that the documents or information called for, if any, are privileged.  In particular, Plaintiff objects to each and every discovery request to the extent that the documents or information called for, if any, are protected by the attorney-client privilege and/or work product doctrine.  Plaintiff also states that any inadvertent production or disclosure of privileged material is not intended, or should not be construed, as a waiver of privilege, and Plaintiff reserves the right to seek the return of any such material and, further, to object to its use.

5.     Plaintiff objects to each and every discovery request to the extent it seeks to vary the obligations imposed upon Plaintiff under the Federal Rules of Civil Procedure.

6.     Plaintiff objects to each and every discovery request to the extent it is vague, ambiguous, overly broad, oppressive, unduly burdensome, or unduly expensive.

7.     Plaintiff objects to each and every discovery request to the extent it seeks confidential or proprietary information.   Similarly, Plaintiff reserves the right to redact confidential or proprietary information from any document that is produced.

8.     Any production to occur at a later date will occur at a mutually convenient time and place.

## Interrogatories

1.     Please identify every person who participated in the response to these interrogatories and the request for production.

**RESPONSE: Plaintiff and Plaintiff's attorney.**

2

2.    Do you contend that the manufactured home, which is the subject of your lawsuit, is defective because Defendant constructed the exterior wall assembly with vinyl-coated gypsum wall boards pursuant to 24 CFR 3280.504(b)(1)?  If yes, then:

(a)    State the basis for your contention;

(b)    Identify each and every fact which supports your contention;

(b)(sic)Identify (with applicable legal authority) what standard of care Defendant breached by constructing the home in this manner; and

(c)(sic)State with specificity all legal authorities you intend to rely upon in advancing this argument.

RESPONSE: Plaintiff objects to this discovery request as being overly broad and burdensome, calls for a legal conclusion and seeks information or documents protected by the attorney client and/or work product privileges and/or information that is held in the opinions of the Plaintiff's expert witnesses that is premature for discovery at this time under FRCP 26(c).    Additionally, this discovery request calls for documents and information in the possession of the Defendant that the Plaintiff seeks to discover and use in support of his allegations, and these discovery responses will be supplemented as discovery develops.  Without waiving these objections, yes. See Plaintiff 's Complaint, and the expert reports of Roy T. Bonney and Bobby Parks previously produced.

The subject home has an improper design and construction of the walls (vapor barrier on living side of the wall structure is vinyl coated gypsum wallboard) and of negative air pressure.  The defect existed at the time of sale but Plaintiff discovered the defect within one year of filing this action.  Because of the defect, excessive moisture accumulation has become trapped within the walls.  The excessive moisture accumulation

3

has led to premature deterioration of wall materials and growth of molds that are potentially harmful to the occupants.

The Federal Manufactured Home Construction and Safety Standards Act, 42 U.S.C. § 5401 et. seq., went into effect June 15, 1976 and is commonly referred to as the "HUD Code." In addition, and relevant to this case, are the Manufactured Home Construction and Safety Standards, 24 C.F.R. § 3280, et. seq., (the "Standards") and the Manufactured Home Procedural and Enforcement Regulations, 24 C.F.R. § 3282 et. seq. (the "regulations").[1] Plaintiff seeks redress for Defendant's failure to comply with these provisions. Defendant has knowingly chosen to build homes to a known defective optional standard (when other reasonable options existed) under 24 C.F.R. § 3280.504.

The very essence of the HUD Code is a mandate that the home meet certain performance based results (e.g. condensation control such that it not be trapped in walls) and thus the manufacturer is provided with several options (with geographic location a considered issue) to achieve the performance based result. Even prior to the waiver only one of the options required a vapor retarder on the living side of the wall (24 CFR § 3280.504(b)(l)), while three others did not (24 CFR § 3280.504(b)(2) and (b)(3) and 24 CFR § 3282.14; *See also* 24 C.F.R. § 3280.10 *Use of alternative construction*. The waiver simply provided yet another option for the manufacturer to enable it to deal with the hot and humid climate found in the Gulf Coast.

42 U.S.C. § 5403. Construction and safety standards:

(a) Establishment.

> (1) Authority. The Secretary shall establish, by order, appropriate Federal manufactured home construction and safety standards, each of which-

---

[1] Collectively, the HUD Code, the Standards and the Regulations shall be referred to as these "provisions" when it is not necessary to specify one.

4

(A) shall-

    (i) be reasonable and practical;

    (ii) meet high standards of protection consistent with the purposes of this <u>title [42 USCS §§ 5401</u>, et seq.]; and

    (iii) <u>be performance-based and objectively stated, unless clearly inappropriate</u>.

This section tells us that these provisions are designed to be, by and large, performance based "unless clearly inappropriate." It is clearly inappropriate when the provisions mandate that the manufacturer has no choice and, in these very limited cases, the Code is prescriptive. Even then, the manufacturer has always been equipped with the ability to seek to use any method it wants (even if they go against prescriptive requirements) as long as it meet or exceeds the standards. See 24 CFR § 3282.14. There is nothing in these provisions mandating that these homes be sold in the condition Defendant has chosen nor that they be sold at all, given the known defects as alleged herein.

    A full and honest reading of these provisions demonstrates that the Secretary followed the federal mandate and, by and large in general and specifically with respect to the issues in this case, created a performance based Code with numerous options at the disposal of the manufacturer to insure durable housing.

    The Regulations themselves again tell us these are performance based Codes. The definition of the Federal manufactured home construction and safety standard follows: "... a reasonable standard for the <u>construction, design, and performance of a manufactured home</u> which meets the needs of the public including the need for <u>quality, durability and safe.</u>" 24 C.F.R. § 3280.2 (emphasis supplied).

42 U.S.C. § 5403 (g) states that alternative approaches must be given so that the manufacturer can achieve or exceed the minimum performance based objectives of the code:

> 42 U.S.C. § 5403 (g) Manufactured housing construction and safety standards.
> (1) The Federal manufactured home construction and safety standards established by the Secretary under this section shall include preemptive energy conservation standards in accordance with this subsection.
> (2) The energy conservation standards established under this subsection shall be cost-effective energy conservation performance standards designed to ensure the lowest total of construction and operating costs.
>
> (3) <u>The energy conservation standards established under this subsection shall take into consideration the design and factory construction techniques of manufactured homes and shall provide for alternative practices that result in net estimated energy consumption equal to or less than the specified standards.</u>

The HUD Code is replete with language that preserves the rights of the homeowner and demonstrates that Congress did not intend to impliedly occupy the entire field: "Nothing in this subpart or in these regulations shall limit the rights of the purchaser under any contract or applicable law."

24 CFR 3282.402(a). 3282.14 Alternative construction of manufactured homes expressly provides:

> (a) Policy. In order to promote the purposes of the Act, the Department will permit the sale or lease of one or more manufactured homes not in compliance with the Standards under circumstances wherein no affirmative action is needed to protect the public interest. The Department encourages innovation and the use of new technology in manufactured homes. Accordingly, HUD will permit manufacturers to utilize new designs or techniques not incompliance with the Standards in cases: (1) Where a manufacturer proposes to utilize construction that would be prohibited by the Standards; (2) Where such construction would provide performance that is equivalent to or superior to that required by the Standards; and (3) Where (i) compliance with the Standards would be reasonable because of the circumstances of the particular case, or (ii) the alternative construction

would be for purposes of research, testing or development of new techniques or designs.

24 CFR § 3282.14 (emphasis supplied); *See also* 24 C.F.R. § 3280.10 Use of alternative construction "Requests for alternative construction can be made.. ."). This section thus gives the manufacturer yet one more option with which to comply with its mandate of safe and durable housing, as long as they meet or exceed the minimum based performance standards.

Defendant is in violation of the very HUD design principals that were established to protect consumers. The language of the HUD Code and the Regulations demonstrate that the manufacturers are left with wide discretion to be able to insure durable, livable and safe housing. 24 C.F.R. 3280.303(b)

Options were left to the discretion of the manufacturer so that the performance based objectives could be obtained. Congress contemplated, because it was necessary, that certain prescriptive standards would not be appropriate in certain geographic locations. The HUD Code states that:

> . . . in recommending standards, regulations, and interpretations, and.. .in establishing standards or regulations or issuing interpretations under this section, [you] shall-- (3) consider whether any such proposed standard is reasonable for the particular type of manufactured home or for the geographic region for which it is prescribed;

42 U.S.C. § 5403(e).

It is the responsibility of the manufacturer to choose from any one of a number of options to achieve the performance based objective, taking into account, among other things, geographic location.

24 C.F.R. § 3280.504(b) (emphasis supplied) provides:

7

(1) Exterior walls shall have a vapor barrier not greater than 1 perm14 (dry cup method) installed on the living space side of the wall, <u>or</u>

(2) Unventilated wall cavities shall have an external covering and/or sheathing which forms the pressure envelope. The covering and/or sheathing shall have a combined permeance of not less than 5.0 perms. In the absence of test data, combined permeance may be computed using the formula: PTotal=(l/[(l/PI)+(l/P2)]) where PI and P2 are the permeance values of the exterior covering and sheathing in perms. Formed exterior siding applied in sections with joints not caulked or sealed shall not be considered to restrict water vapor transmission, <u>or</u>

(3) Wall cavities shall be constructed so that ventilation is provided to dissipate any condensation occurring in these cavities.

Section 3280.504(b)(2) does not require a vapor retarder. Section 3280.504(b)(3) does not require a vapor retarder but merely that ". . . ventilation is provided to dissipate any condensation occurring in these cavities." Thus, two-thirds of the options that existed prior to the "waiver" being "implemented" did not require a vapor retarder on the living side. There exists yet another section even prior to the waiver found in 24 CFR § 282.14 which allows ". . .new designs or techniques not incompliance with the Standards... in cases...[w]here such construction would provide performance that is equivalent to or superior to that required by the Standards; and . . . where compliance with the Standards would be unreasonable because of the circumstances of the particular case." *Id.* This provides the manufacturer with the ability to make the house perform which is a mandated responsibility to insure durable and safe housing.

The now fifth option, the waiver, does not require that the vapor retarder be placed on the living side of the walls either. Thus, four-fifths of the options now available to the manufacturer do not require what the manufacturer implies is a federally mandated choice. The title of § 3280.504 is "Condensation control and installation of vapor

8

retarders" and only one of the many options actually requires a vapor retarder on the living side.

Defendant has violated 24 C.F.R. § 3280.103(b)(3) which states, *inter alia*: "The ventilation system or provisions shall not create a positive pressure in Uo value Zones 2 and 3 or a negative pressure condition in Uo value Zone 1 ."[2] One of the many reasons you do not want a "negative air pressure" in Zone 1 (Florida among others) is that you do not want to suck the hot, moist air into the home (which would then be trapped if you placed a vapor barrier on the living side as is alleged to have occurred here).

Section 3280.504(b) provides options by use of the word "or" and requires the manufacturer to choose one of these options so that the home will obtain a performance level of durable, safe housing. The goal is to dissipate any condensation occurring in these cavities as stated in these subsections. HUD recognized that in humid and fringe climate areas, the manufacturer would need options to achieve the performance based objective of the Code and that, indeed, some construction techniques could be detrimental to this goal. Publishing the alternatives provided manufacturers with an alternative that a manufacturer can use in the design and construction of manufactured homes that may be compatible with their construction techniques.

On or about March 30, 2000, the Director, Manufactured Housing and Standards Division, Office of Consumer and Regulatory Affairs, Room 9156, Department of Housing and Urban Development (hereinafter the "Department") published a proposed waiver to 24 CFR 3280.504 of the Manufactured Home Construction and Safety Standards on March 30, 2000 (65FR 17110).

---

[2] Zone 1 includes Texas, Louisiana, Mississippi, Alabama, Georgia, South Carolina and Florida State.

HUD in fact issued a waiver that applied to the first of the alternatives available under § 3280.504(b), although as stated, neither (b)(2), (b)(3) or the alternative methods ever had such a requirement to begin with. Specifically, this waiver allowed manufacturers of homes for humid and fringe climates to install the vapor retarder on the exterior side, rather than the interior or living space side, of the exterior wall, provided: (1) The exterior side of the exterior wall is constructed with a vapor retarder or exterior covering and sheathing that has a permeance not greater than 1.0 perm; and (2) the interior finish and interior wall panels are designed with a 5 perm or higher rating. The waiver also required manufacturers to add a statement and a map to the data plate indicating that the home is only suitable for installation in humid and fringe climates (the map designated the acceptable locations for which the waiver is applicable).

The waiver that was urged by many manufacturers in the industry and approved by HUD stated: § 3280.504 Condensation control and installation of vapor retarders:    (4) Homes manufactured to be sited in "humid climates" or "fringe climates" as shown on the Humid and Fringe Climate Map in this paragraph shall be permitted to have a vapor retarder specified in paragraph (b)(1) of this section installed on the exterior side of the wall insulation or be constructed with an external covering and sheathing with a combined permeance of not greater than 1.0 perm, provided the interior finish and interior wall panel materials have a combined permeance of not less than 5.0 perm.

The Humid and Fringe Climate Map stated that "following areas of local governments (counties or similar areas, unless otherwise specified), listed by State are deemed to be within the humid and fringe climate areas shown on the Humid and Fringe Climate Map in paragraph (b)(4) of this section, and the vapor retarder specified in

10

paragraph (b)(4) of this section may be applied to homes built to be sited within these jurisdictions":

Alabama - Baldwin, Barbour, Bullock, Butler, Choctaw, Clarke, Coffee, Conecuh, Covington, Crenshaw, Dale, Escambia, Geneva, Henry, Houston, Lowndes, Marengo, Mobile, Monroe, Montgomery, Pike, Washington, Wilcox.

Florida - All counties and locations within the State of Florida.

Georgia - Appling, Atkinson, Bacon, Baker, Ben Hill, Berrien, Brantley, Brooks, Bryan, Calhoun, Camden, Charlton, Chatham, Clay, Clinch, Coffee, Colquitt, Cook, Crisp, Decatur, Dougherty, Early, Echols, Effingham, Evans, Glynn, Wayne, Grady, Irwin, Jeff Davis, Lanier, Lee, Liberty, Long, Lowndes, McIntosh, Miller, Mitchell, Pierce, Quitman, Randolph, Seminole, Tattnall, Terrell, Thomas, Tift, Turner, Ware, Worth.

Louisiana
All counties and locations within the State of Louisiana.

Mississippi
Adams, Amite, Clairbourne, Clarke, Copiah, Covington, Forrest, Franklin, George, Greene, Hancock, Harrison, Hinds, Issaquena, Jackson, Jasper, Jefferson, Jefferson Davis, Jones, Lamar, Lawrence, Lincoln, Pearl River, Perry, Pike, Rankin, Simpson, Smith, Stone, Walthall, Warren, Wayne, Wilkinson.

North Carolina
Brunswick, Carteret, Columbus, New Hanover, Onslow, Pender.

South Carolina
Jasper, Beaufort, Colleton, Dorchester, Charleston, Berkeley, Georgetown, Horry.

Texas Anderson, Angelina, Aransas, Atacosa, Austin, Bastrop, Bee, Bexar, Brazoria, Brazos, Brooks, Burleson, Caldwell, Calhoun, Cameron, Camp, Cass, Chambers, Cherokee, Colorado, Comal, De Witt, Dimmit, Duval, Falls, Fayette, Fort Bend, Franklin, Freestone, Frio, Galveston, Goliad, Gonzales, Gregg, Grimes, Guadalupe, Hardin, Harris, Harrison, Hays, Henderson, Hidalgo, Hopkins, Houston, Jackson, Jasper, Jefferson, Jim Hogg, Jim Wells, Karnes, Kaufman, Kennedy, Kinney, Kleberg, La Salle, Lavaca, Lee, Leon, Liberty, Limestone, Live Oak, Madison, Marion, Matagorda, Maverick, McMullen, Medina, Milam, Montgomery, Morris, Nacogdoches, Navarro, Newton, Nueces, Orange, Panola, Polk, Rains, Refugio, Robertson, Rusk, Sabine, San Augustine, San Jacinto, San Patricio, Shelby, Smith, Starr, Titus, Travis, Trinity, Tyler, Upshur, Uvalde, Val Verde, Van Zandt, Victoria, Walker, Waller, Washington, Webb, Wharton, Willacy, Williamson, Wilson, Wood, Zapata, Zavala.

These respective Counties shall hereinafter be referred to as the "Gulf Coast Region." This map is hardly something new and had been in essence created from the air condition and heating in 1989.

The manufactured homes designed and manufactured by Defendant, including the manufactured home purchased by Plaintiff, have an improper design and construction of exterior walls and of negative air pressure in violation of HUD Manufactured Home Construction and Safety Standards. The defect existed at the time of sale and Plaintiff was provided with a written manufacturer warranty that expressly warranted that the home was free from defect.

Defendant has known of the defect in the design and manufacturer of homes sold in the respective State and Counties indicated above since at least the early 1990's.

Because of the design defect, moisture condensation will become trapped within the walls and result in "sweating walls" - a condition wherein water will begin to seep out of openings that may exist in the wall like the screw holes for a smoke detector or nail holes for a picture hanger. The defect results in "soft walls" throughout the home because the moisture problems associated with this design defect literally make it possible to poke a finger through the gypsum wallboard a/k/a sheetrock in the home. Black mold and various other types of fungal growth will appear as a result of this defect. The home is rendered worthless. Because this phenomenon occurs in the Gulf Coast Region, this condition is known to some within the industry as "Gulf Coast Syndrome."

Any and all complaints to Defendant has resulted in inadequate relief and despite a reasonable opportunity and repeated complaints by countless individuals, Defendant merely at most offers to replace the gypsum wallboard on occasion. This does not remedy the cause of the problem as the new gypsum wallboard will deteriorate in the same manner as the replaced gypsum wallboard did. Defendant never informs the consumer of the known defect and fail to offer a full refund of the purchase price.

12

Additionally, the HUD Code mandates that the homes be built in accordance with accepted engineering practices. *See* 24 C.F.R. § 3280.303(b). The following well settled studies show that the Defendant's design is contrary to accepted engineering practices in this region.

### Department of Housing and Urban Development (HUD) research Grant
### 1995 - *Manufactured Housing Walls That Provide Satisfactory Moisture Performance in All Climates.*

"A current-practice manufactured housing wall with an interior vapor retarder was shown to provide satisfactory performance in cold climates, but poor performance in a hot, humid climate. The use of an interior vapor retarder in the wall of an air conditioned building exposed to a hot and humid climate can cause high relative humidity at its outside surface, thereby providing a conducive environment for mold and mildew growth."

### Manufactured Housing Research Alliance
### 1999 - *Moisture Problems in Manufactured Homes, Understanding Their causes and Finding Solutions*

"The interior vapor retarder acts like a dam holding water inside the wall board. When the conditions support condensation inside the wall, water will begin to condense on the coldest material—in this case, the inner surface of the wallboard. If the conditions for drying are poor—the outside humidity is high and the vapor retarder blocks diffusion to the inside— moisture will begin to accumulate on the surface and saturate the material. If the wall board cannot dry out, it will eventually fail completely.

### Department of Housing and Urban Development (HUD)
### 24 CFR Part 3280
### 2000 - *Condensation Control for Exterior Walls of Manufactured Homes Sited in Humid and Fringe Climates; Proposed Rule*

"The states have provided HUD with information that indicates there is an immediate need to consider alternate requirements for exterior walls in these humid and fringe climate areas, to prevent moisture damage due to condensation"....

"The interior surface of the exterior wall should also then be constructed of a permeable material.... In such cases, use of vapor retarder paints, vinyl covered gypsum wallboard, or other impermeable materials or finishes on the interior side of exterior walls would be detrimental, because they would trap moisture within the wall."

13

Florida Solar Energy Center (FSEC)
**2000 - *Moisture Problems in Manufactured Housing:***
***Probable Causes and Cures***

<u>Building Science Basics For Moisture Plagued Homes</u>"In the hot and humid Southeastern U.S., the outside air is consistently above a dewpoint of 75°F during the summer months. If the homeowner decides to keep the interior temperature of the home below 75°F, in an effort to maintain comfort, or if an interior surface is cooled below the exterior dewpoint temperature, then when moisture-laden outside air comes into contact with cold inside surfaces, condensation occurs. <u>If it condenses behind an impermeable surface such as</u> vinyl flooring or <u>vinyl wallpaper, wall board damage, floor buckling problems and mold problems can result.</u>

Manufactured Housing Research Alliance
Manufactured Housing Technologies
**2000 - *Solving Moisture Problems in Manufactured Housing***
<u>"When the vapor retarder is on the interior wall in hot, humid climate,</u>
warm, moist air that enters the wall cavity can accumulate on the cold interior wall board, <u>causing it to swell and disintegrate."</u>

Home Energy
**2000 - *Moisture Problems in Manufactured Housing***
<u>"Vapor retarder in the wrong location. (100% of the homes investigated)"</u>...
"All the homes inspected that experienced wallboard failure used vinyl-coated wallboard. Typical symptoms included staining of the vinyl wall covering and bowing of the wallboards."

Department of Housing and Urban Development (HUD)
24 CFR Part 3280
**2002 - *Condensation Control for Exterior Walls of Manufactured Homes Sited in Humid and Fringe Climates; Final Rule***
A. <u>Exterior walls must</u> be constructed with one of the following installed of the <u>exterior side of the wall assembly:</u> (1) <u>A vapor retarder of not greater than 1.0 perm</u>.... or (2) an external covering and sheathing with a combined permeance of <u>not greater than 1.0 perm.</u>

B. The <u>interior finish</u> and <u>interior wall panel materials</u> must have a combined vapor permeance <u>greater</u> than 5.0 perm .....

C. Exterior wall cavities shall not be ventilated to the outdoors.

14

**The Partnership for Advancing Technology in Housing (PATH)**
*2003 - Alternatives for Minimizing Moisture Problems in Homes Located in Hot,*
*Humid Climates: Interim Report*
"Most building scientists agree that a vapor retarder is preferred on the warm side of the
wall assembly (the outside in predominately hot, humid climates) 2324. Vapor retarders
located on the interior side of a wall (the cool side in hot, humid climates) diminishes the
ability of the wall cavity to dry towards the climate-controlled interior, and can allow
moisture invading from the outside to accumulate within the wall cavity, potentially
leading to condensation."

**The Partnership for Advancing Technology in Housing (PATH)**
*2003 - Minimizing Moisture Problems in Homes Located in Hot, Humid*
*Climates: Final Report*
Location of vapor retarders. In hot, humid climates, the interior of building shell
components should be vapor permeable, allowing cavities to dry in the direction of the
home's interior.

**Building America / U.S. Department of Energy**
*2004 - Alleviating Moisture Problems in Hot, Humid Climate Housing*
"A significant number of new manufactured (mobile) homes built to the HUD Code and
located in the hot, humid Southeast are experiencing moisture problems. Soft wallboards,
buckled floors, damaged wood molding and extensive mold growth are the most common
symptoms."......  "* Vapor retarder in the wrong location i.e. vinyl or other impermeable
wall or floor coverings located on the cool side of the assembly. colder surfaces."

**Prepared for: U.S. Department of Housing and Urban Development Washington, D.C.**
**October 2004 Office of Policy Development and Research**
*2004 – Building Moisture and Durability*
"As discussed in the Moisture Control Handbook, moisture problems arise when houses in
cooling climates are built with interior (e.g. behind the drywall or an interior wall covering)
vapor diffusion retarders. Low permeance interior wall coverings (e.g. vinyl wallpaper,
vapor impermeable interior paints) and polyethylene vapor retarders located behind
drywall can create moisture problems when hot, humid outdoor air comes in contact with
these surfaces.

**U.S. Department of Housing and Urban Development (HUD)**
*2006 - Moisture-Resistant Homes*
"In hot/humid climates exterior wall systems should dry towards the interior by locating
vapor retarding materials on the outside of the wall assembly and keeping interior
materials vapor permeable"....

15

"Finishes that could compromise the wall's ability to dry inward
include vinyl wallpaper finishes and vapor barrier paints."

## ASHRAE CHAPTER 23
## 2005 - *THERMAL AND MOISTURE CONTROL IN INSULATED ASSEMBLIES: Fundamentals*

In typical building situations, however, water vapor is present and the reflective facing
should be placed on the warm side of the air space; otherwise, condensation can increase
the emittance and reduce the insulation value......an airflow retarder should not be where it
can cause moisture to condense if it also has vapor-retarding properties. For example, an
airflow retarder placed on the cold side of a building envelope may cause condensation,
particularly if the vapor retarder at the inside is ineffective.

## ASHRAE CHAPTER 24
## 2005- *THERMAL AND MOISTURE CONTROL IN INSULATED ASSEMBLIES APPLICATIONS*

"Low-permeance paints, <u>vinyl wallpaper</u>, or any other similar low-permeance material
<u>should not be used on the inside of walls</u> and ceilings in warm, humid cooling climates."

New Texas Residential Building and Energy Code Requirements as of 2002
### *Vapor Barrier Ban –*
A vapor barrier (permeability rating of less than 1.0perm) on the warm-in-winter side of
the framing is not allowed."

"In a hot, humid climate, vapor barriers on the warm-in-winter side cause moisture and
mold problems."

A Technical Report by .... Johns Manville
### *"Not in My Building" Moisture and Mold Growth /*
### *and the Specification of Wall coverings*
"One of he more storied causes of moisture damage in buildings come from moisture
condensation behind <u>impermeable wall coverings like vinyl</u>"

Bailey Engineering Corporation
### *Air Infiltration in Coastal Regions / The "Paston Effect"*
"<u>*Never ever*</u> install a vapor retarder on the inside of an outside wall. Vinyl wall
coverings have become a biological playground..."

Sto Corp
### *Moisture Control Principles for Design and Construction of Wall Assemblies*
"* Do not install interior vapor retarders in hot, humid climates..."

16

Florida Solar Energy Center
*Managing Mold in Your Florida Home: A Consumer Guide*
"Vinyl Wall Covering:  Impermeable interior surfaces like <u>vinyl wall coverings can result in severe mold problems</u> in hot humid climates such as Florida's. Moisture coming from outdoors can accumulate within the gypsum wallboard that is behind the vinyl wall covering."

Clemson University
*Residential Housing Moisture: Build to Keep It Out of Homes in The Warm, Humid Climate*
Moisture trapped by <u>vinyl wall coverings</u> or vapor retarders <u>enables mold to grow</u>, reducing insulation values and enhances decay in stud spaces.
<u>This destroys the strength of the structure</u>."

3.    If your response to Interrogatory No. 2 is no, then:

    (a)    Identify what standard of care under the Housing and Urban Development Regulations and/or the Manufactured Home Construction and Safety Standards you contend Defendant breached by constructing the home in the manner it did;

    (b)    Identify each and every fact which supports your contention; and

    (c)    State with specificity all legal authorities you intend to rely upon in advancing this argument.

<u>RESPONSE</u>: Not applicable.

17

Harold Kelly Murphy

STATE OF ALABAMA        :

COUNTY OF Montgomery :

BEFORE ME, the undersigned authority, a notary public in and for said State and County, personally appeared HAROLD KELLY MURPHY, who first being first sworn by me, deposes and says that he has read and/or has had read to him the foregoing instrument and says that he did voluntarily sign the same after being advised of the nature and effects thereof, and authorizes its filing with the Court.

SWORN TO AND SUBSCRIBED on this the 11 day of December, 2006.

NOTARY PUBLIC
Commission Expires: 4-19-09

18

<u>Request for Production of Documents</u>

1.     If your response to Interrogatory #2 is yes, then produce all documents which support your response.

<u>RESPONSE</u>: Plaintiff objects to this discovery request as being overly broad and burdensome and seeks information or documents protected by the attorney client and/or work product privileges and/or information that is held in the opinions of the Plaintiff's expert witnesses that is premature for discovery at this time under FRCP 26(c). Additionally, there are documents and information in the possession of the Defendant that Plaintiff seeks to discover and use in support of his allegations, and these discovery responses will be supplemented as discovery develops.  Furthermore, there is information responsive to this discovery request that is in the possession of the Federal and State Government Agencies and other third parties that is as easily obtained by the Defendant as obtained by Plaintiff.   Without waiving these objections, Plaintiff will produce all documents that at this time are  in his possession , custody and control that are not protected or subject to the above referenced objections at a mutually agreed upon time and place for inspection, copying and review.

2.     If your response to Interrogatory #2 is no, then produce all documents which support your response.

<u>RESPONSE</u>: Not applicable.

C. Lance Gould (ASB-0913-G66C)
Attorney for Plaintiff

OF COUNSEL:

BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
Post Office Box 4160
Montgomery, AL  36103
(334) 269-2343
(334) 954-7555 (fax)

20

## CERTIFICATE OF SERVICE

I, C. Lance Gould, one of the attorneys for the Plaintiff, do hereby certify that I have this

day caused a true and correct copy of the foregoing instrument to be delivered to the following,

by U.S. Mail:

      Mitchel H. Boles
      Robert D. Segall
      Lee H. Copeland
      COPELAND, FRANCO, SCREWS & GILL, P.A.
      P. O. Box 347
      Montgomery, AL 36101

THIS the _21st_ day of _December_, 2006.

Of Counsel