**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA,
NORTHERN DIVISION**

| | |
|---|---|
| **HAROLD KELLY MURPHY,** | ) |
| | ) |
| **Plaintiff.** | ) |
| | ) |
| **v.** | )    **Case No.: 2:06-cv-618-MEF** |
| | ) |
| **SOUTHERN ENERGY HOMES, INC.,** | ) |
| **et al.,** | ) |
| | ) |
| **Defendants.** | ) |

**SOUTHERN ENERGY HOMES, INC.'S MOTION TO EXCLUDE TESTIMONY AND
OPINIONS OF PLAINTIFF'S EXPERT ROBERT KONDNER AND REQUEST FOR *IN
LIMINE* HEARING**

Defendant Southern Energy Homes, Inc. ("Southern") hereby moves this Court to

exclude under *Daubert v. Merrill Dow Pharmaceuticals*, 509 U.S. 579 (1992), and Fed. R. Evid.

702, the expert testimony of Plaintiff's proposed expert Robert Kondner ("Kondner").  Pursuant

to Fed. R. Evid. 104, Southern requests a hearing on this motion.  As grounds for this motion,

Southern states as follows:

## INTRODUCTION

This lawsuit is one among dozens of individual and class action cases that have recently

been brought before state and federal courts in Alabama, Louisiana and Texas.  In these actions,

plaintiffs claim that manufactured homes sold in certain coastal and inland regions from Texas to

North Carolina[1] are defective because the exterior walls of such homes are constructed with

interior vapor barriers.  Plaintiff Harold Kelly Murphy ("Murphy" or "Plaintiff") purchased a

---

[1] These areas are known as the "humid and fringe zone climates."  The counties included in these regions were identified in the Federal Register at 67 F.R. 20402-20403 (April 24, 2002), and are now listed in 24 C.F.R. § 3280.504(b)(4).

new Southern manufactured home on December 23, 2003.  Complaint, Exhibit A, ¶ 7.  Murphy

alleges that the home has defectively designed and constructed exterior walls.  *Id*. at ¶ 4.

The two sections of the HUD Code primarily at issue in this lawsuit are Sections 303(b)

and 504(b).  Section 303(b) provides that "All construction methods shall be in conformance

with accepted engineering practices to insure durable, livable, and safe housing and shall

demonstrate acceptable workmanship reflecting journeyman quality of work of the various

trades."  24 C.F.R. § 3280.303(b).  Section 504(b) governs condensation control in the exterior

walls of manufactured homes, and provides for four expressly allowed wall designs.  24 C.F.R. §

3280.504(b).  One of the design options specifically allowed by § 504(b) is to construct the walls

with a vapor barrier of 1 perm[2] or less on the living space side of the wall.  *Id*. at § 504(b)(1).  It

was this design option that Southern used in the Murphy home, constructing the walls with vinyl-

covered gypsum wallboard containing an interior (i.e. on the living side of the wall) vapor barrier

with a permeability rating of less than one.

Murphy bases his claims for liability primarily on the opinions and reports of three

specially-retained "expert" witnesses: Bobby Parks, Robert Kondner, and Roy Bonney.[3]

Kondner concludes without actually inspecting the Murphy home that the wall design violates

HUD Code § 303(b) and that the exterior walls in the Murphy home suffer from fungal growth

and structural deterioration as a result.  *See* Kondner Report, Exhibit B, p. 6.  These opinions

---

[2] Permeance is the measure of the amount of water vapor (moisture) that can pass through a specified material in a certain amount of time.  The measure and degree of permeability is expressed in units referred to as 'perms.'  Materials with high perm levels will allow more moisture or water vapor to pass through than those with lower perm values.

[3] Parks performed two inspections of the Murphy home and concluded that the wall design violates the HUD Code Section 303(b) standards for accepted engineering practices and that the exterior walls in the Murphy home suffer from extreme moisture, fungal growth, and structural deterioration as a result.  Parks is the subject of a separate *Daubert* motion that will be referenced frequently in this motion because Kondner's opinions are based almost entirely on Parks' unqualified and unreliable opinions.  Bonney is offered exclusively for determining the cost involved in replacing any wallboard portions that are found to be defective.  As a result, Bonney's testimony is not relevant to the issue of liability and is only relevant to damages in the event liability is found.

must be stringently evaluated by this Court in its capacity as a gatekeeper under *Daubert* and Rule 702.

## SUMMARY OF ARGUMENT

Kondner's testimony and opinions should be excluded because he cannot satisfy the requirements for the admissibility of expert testimony under Rule 702 and *Daubert*. He has no experience with engineering design in the manufactured housing industry and has never even seen a mobile home built in a HUD Code setting. He lacks familiarity with many basic principles and provisions of the HUD Code, and cannot even claim to have read all of the Code provisions at issue. He does not claim to be an expert, nor does he claim to have any experience, in the areas of HVAC, mold analysis or interpretation, moisture meters, thermographic imaging, or gypsum. As a result, Kondner is not qualified to offer opinions in any of these areas.

In addition, Kondner did not rely on sufficient facts or data in his investigation. First and foremost, Kondner has never even visited, much less inspected, the Murphy home, nor has he conducted any independent research into the performance of the Murphy exterior walls. Instead, he relies entirely on the unreliable and unsupported conclusions of HVAC repairman Bobby Parks.[4] Kondner also ignores the plain language of the HUD Code (and HUD's own interpretation of it) by offering the opinion that the wall design of the Murphy home violates the HUD Code. This is a remarkable opinion because *this wall design is specifically approved for all regions by the HUD Code*. In short, Kondner's qualifications and the factual basis for his contentions are entirely inadequate.

Finally, even if Kondner were to have the necessary qualifications (which he does not), and even if Kondner were to base his opinions on sufficient facts (which he does not), his

---

[4] Southern hereby adopts by reference and incorporates into this motion all arguments regarding Parks' qualifications, methodology, and conclusions contained in Southern's separately filed *Daubert* motion to exclude Parks' testimony and opinions.

testimony still must be excluded because it is cumulative and duplicative of Parks' proposed testimony. Kondner's conclusions are exactly the same as Parks', and because Kondner conducted no independent research or analysis, the conclusions are based on the same data collected by Parks. The only reason Kondner is being called is to use an engineer to try to bolster the credibility of HVAC repairman Bobby Parks' unqualified and unsupported opinions regarding the design, Code compliance and performance of the Murphy walls.

For all of these reasons, Southern respectfully requests that this Court exclude the testimony and opinions of proposed 'expert' Robert Kondner.

## STANDARD FOR ADMITTING EXPERT TESTIMONY

Federal Rule of Evidence 702 governs the use of expert testimony. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

The Supreme Court has instructed the district courts to act as "gatekeepers" in screening expert testimony. *See General Electric v. Joiner*, 522 U.S. 136, 140 (1997) (upholding a district court decision to exclude expert testimony on the ground that it "did not rise above 'subjective belief or unsupported speculation'"); *Club Car, Inc. v. Club Car (Quebec) Import, Inc.*, 362 F.3d 775, 780 (11th Cir. 2004) (affirming district court's exclusion of accountant's lost profit calculations on the grounds that it "was based on flawed methodology that was unaccepted in the accounting community"); *KW Plastics v. U.S. Can Co.*, 131 F. Supp. 2d 1289, 1294 (M.D. Ala.

2001) (motion to exclude expert's testimony on damages granted on the grounds that the "cumulative effect of [the expert's] methodological errors render[ed] the lost profits calculations speculative, without foundation, and with an unknown error rate" and therefore, "the calculations [fell] outside of the range where experts may reasonably differ."); *Benkwith v. Matrixx Initiatives, Inc*., 467 F. Supp. 2d 1316, 1332 (M.D. Ala. 2006) (opinion by J. Fuller) (excluding the proposed expert testimony of a doctor in a product liability action against a nasal spray manufacturer and distributor because the expert did not "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field").

In this case, Murphy bears the burden of proof as to the factual basis for Kondner's qualifications and conclusions.  *See McCorvey v. Baxter Healthcare Corp*., 298 F.3d 1253, 1256 (11th Cir. 2002); *Allison*, 184 F.3d at 1306 (the "burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence.").  As detailed below, Murphy cannot carry his burden.

## ARGUMENT

The testimony and opinions of Robert Kondner should be excluded because Kondner is not qualified as an expert in the design of manufactured housing or the interpretation of the HUD Code.  Furthermore, Kondner relies on insufficient and inaccurate facts and data to reach his conclusions.  Finally, Kondner's testimony is cumulative and must be excluded under Rule 403.

### I.    Kondner Is Not Qualified to Testify to These Matters

Kondner proposes to testify that the exterior walls in the Murphy home are designed improperly, do not comply with HUD Code regulations, and are suffering from structural deterioration and fungal growth as a result of excess moisture accumulation.  *See* Kondner

Report at 6.  Kondner, however, even by his own admission, is unqualified to testify as an expert about these matters:

> Q.   You're not a HUD Code expert?
> A.   That's correct.
> Q.   You're not a mold expert?
> A.   That's correct.
> Q.   You're not a gypsum expert?
> A.   That's correct.
> Q.   And you're not a thermographic imaging expert?
> A.   That's correct.
> Q.   You've never designed a wall system in a HUD Code home in your life?
> A.   That's correct.
> …
> Q.   Are you an expert in moisture meters?
> A.   No, I'm not.

Kondner Depo. Excerpts in *Ford v. Southern Energy Homes, Inc.*, Exhibit C, pp. 12:1-13:1, 33:7-8.

### A.    Kondner Is Not Qualified to Offer Design Opinions

To be sufficiently qualified to testify as an expert, a witness must have the knowledge, skill, training and education in the subject for which his testimony is offered.  Fed. R. Evid. 702; *Maiz v. Virani*, 253 F.3d 641, 644 (11th Cir. 2001) (proponent's first burden is to show that its proposed expert is "qualified to testify competently regarding the matters he intends to address.").  Whatever general experience Kondner may have as an engineer, that does not qualify him to testify about design issues with the wall construction in manufactured housing.  *See Tokio Marine & Fire Ins. Co. v. Grove Mfg. Co.*, 762 F. Supp. 1016 (D.P.R. 1991) (holding that a civil engineer was not competent to testify as to crane design issues because he had no experience with the design or manufacturing of cranes; a mechanical engineer would be better suited to testify); *Perkins v. Volkswagen of America, Inc.*, 596 F.2d 681 (5th Cir. 1979) (upheld a lower court ruling that a mechanical engineer with no experience designing automobiles was not competent to testify as to design issues); *Hoban v. Grumman, Corp.*, 717 F. Supp. 1129 (E.D.

6

Va. 1989) (holding that a licensed professional engineer with degrees in electrical and mechanical engineering who had done no aerodynamic design work or engine design work was not competent to testify on such design issues).

In this case, Kondner has no design experience in the manufactured housing or wall construction field:

> Q.   Have you ever rendered a design opinion as to manufacturing standards in a manufactured home?
> A.   I don't think so.  Could be.  I've been around a long time.
> …
> Q.   I think you've testified previously you don't have any experience in the manufacturing housing industry itself, do you?
> A.   Manufactured housing?  Well, not trailers, no.  I don't think so.

Kondner Depo.,[5] Exhibit D, pp. 88:10-89:2.  Furthermore, Kondner admits that he has never even seen a manufactured home constructed in a factory setting, and he does not know how long it takes to build one.  Kondner Depo. Excerpts in *Ford* at 10:16-11:5.  Pursuant to *Tokio Marine, Perkins, and Hoban*, then, Kondner is not competent to testify as to design issues in an unfamiliar field.

**B.    Kondner Is Not Qualified to Offer Opinions Regarding HUD Code Compliance**

Kondner's deposition testimony and conclusions display a fundamental lack of familiarity with, and misunderstanding of, the HUD Code.  As discussed *supra*, HUD Code Section 504(b) governs condensation control in the exterior walls of manufactured homes and expressly allows four different wall construction designs.  Kondner claims that Southern's application of § 504(b) to the Murphy home provides the primary basis for liability in this case, yet Kondner is not even familiar with the basic design principles employed by § 504(b).  In addition to Kondner's own admission that he is not an expert in the HUD Code, his lack of

---

[5] If not otherwise noted, references to Kondner deposition testimony will refer to his deposition in this case, taken on December 21, 2007, the same day that he was deposed in the *Ford* case referenced above.

knowledge about the Code is evident from Kondner's inability to even identify the four construction methods expressly allowed by the HUD Code, much less describe in detail how to design them.  *See* Kondner Depo. at 45:22-46:13.

Kondner's testimony raises serious doubt as to whether Kondner has ever even read the relevant provisions of the Code, much less understands them at an expert level:

> Q.   Do you have any idea where the waiver actually is?
> A.   Where the waiver of what is?  Oh, in this code?
> Q.   The wall design waiver; have you ever read it?
> A.   It would have to be back in 504.  Let's go back to 504.
> Q.   Doctor, it's not in there.  Have you ever read it?
> A.   I don't know whether I ever have or not.

Kondner Depo. Excerpts in *Ford* at 27:3-13.  Kondner devotes more than one-fifth of his entire written report  to this waiver, describing it in detail and rendering opinions on it that he claims to have reached on his own, yet he cannot even identify where it is in the Code, or that he has even read it.  *See* Kondner Report.

Furthermore, as explained below, Kondner does not understand how various provisions of the HUD Code relate to each other, as evidenced by his opinion that a wall construction method can violate § 303(b),[6] a general performance standard, even though it meets the requirements of Section 504(b), a specific prescriptive standard.  *See* Kondner Depo. at 42:2-6.

HUD develops its safety standards for the Code through a consensus process that relies on professionals with engineering expertise who provide conclusive technical documentation on issues to establish sound engineering practices.  *See* Declaration of David Tompos, P.E., Exhibit E.   As a result, the Code embodies sound engineering practices, and meeting the specific

---

[6] As mentioned *supra*, Section 303(b) provides that "All construction methods shall be in conformance with accepted engineering practices to insure durable, livable, and safe housing and shall demonstrate acceptable workmanship reflecting journeyman quality of work of the various trades."  24 C.F.R. § 3280.303(b).

requirements of this Code that is developed in this manner therefore conforms to sound and accepted engineering practices. *Id.*

Section 504(b) of the Code allows for four alternative designs for exterior walls in mobile homes: 1) walls with an interior vapor barrier of one perm or less, or 2) unventilated wall cavities sealed by a pressure envelope of at least five perms, or 3) ventilated wall cavities, or 4) for homes in Zone 1,[7] a vapor barrier *may* be placed on the opposite side of the wall from the living space. *See* 24 C.F.R. § 3280.504(b). Each of these alternative construction designs has been deemed by HUD to represent good engineering practices. *See* Tompos Declaration. Nothing in the Code prohibits the use of a 504(b)(1) wall construction in Zone 1. *See generally* 24 C.F.R. § 3280. Furthermore, HUD has stated that it does not have data, research, or other information that would substantiate restricting § 504(b)(1) to Zones 2 and 3. *See* Tompos Declaration. Indeed, the wall designs utilized in the Murphy home are the most widely used condensation control method in the industry for all climactic conditions and have been approved by a third party inspection agency comprised of engineer design professionals as required by the HUD regulations. *Id.*

Kondner argues that because Section 303(b) requires all manufactured homes to be built in accordance with "accepted engineering practices," placing an interior vapor barrier in a hot and fringe zone climate violates the HUD Code even though Section 504(b)(1) specifies interior vapor barriers as an appropriate design option for every climate zone. *See* 24 C.F.R. at §§ 3280.303(b), 3280.504(b)(1). Kondner's opinion fundamentally misrepresents HUD's own code interpretation and its enforcement policy. As HUD has explicitly stated as recently as 2007:

---

[7] The HUD Code divides the United States into three geographic regions, called 'thermal zones.' Zone 1 encompasses much of the Southeastern U.S. from Texas to North Carolina, Zone 2 extends across the country's midsection from North Carolina to California, and Zone 3 encompasses most of the northern half of the country. 24 C.F.R. § 3280.506.

> Consistent with basic principles of administrative law, it is HUD's practice to hold manufacturers accountable for compliance with the standard that most specifically applies to a particular aspect of construction. Accordingly, there is no case in which HUD has applied 3280.303(b) to a manufacturer that has complied with 3280.504(b).

HUD Letter from Assoc. Dep. Asst. Sec. for Reg. Affairs and Mfr'd Housing, January 19, 2007, Exhibit F.

Based on Kondner's own admission that he is not a HUD Code expert, as well as his statements and opinions exhibiting a fundamental misunderstanding of basic principles contained within the HUD Code, Kondner should not be allowed to opine that the Murphy wall construction violates the HUD Code.

**C.    Kondner Is Not Qualified to Offer Opinions Related to the Interpretation of Mold Sampling Data, Moisture Meter Readings, Thermographic Imaging Results, and HVAC testing**

Kondner also lacks the qualifications necessary to interpret mold sampling data, moisture meter readings, thermographic imaging, and HVAC testing. As noted above, Kondner himself admits that he is not a mold expert or a thermographic imaging expert. *See supra*, Kondner Depo. Excerpts in *Ford* at 12:1-13:1. Kondner further admits that he is not an expert in HVAC testing or the standard of care for determining moisture content of gypsum:

> Q.    Sir, are you an expert on the standard of care with regard to moisture content in gypsum?
> A.    No, I wouldn't say I was.
> …
> Q.    You're not an air conditioning / heating ventilation expert, are you?
> A.    No, no, no.

*See* Kondner Depo. at 27:12-14, 152:20-22. Kondner goes on to admit that he has no training whatsoever in thermographic imaging. *Id*. at 131:21-23. He displays his lack of understanding of moisture meter readings by stating his belief that they convey the absolute moisture content of gypsum, as opposed to relative readings. *See id.* at 19:19 ("To me, it's an absolute value.").

This is a crucial admission, as even Parks agrees that moisture meter readings are only relative and not absolute. *See* Parks Depo. Excerpt, Exhibit G, pp. 131:20-132:7. Discussing the HVAC system in the Murphy home, Kondner not only admits that he is not an HVAC expert, but also that he has no independent expertise with fundamental components of the system at issue:

> Q.    Doctor, what I'm trying to establish is you're just reading [Parks'] report; you don't have any independent expertise in that particular mechanical system, correct?
> A.    I have never seen the system. I have never seen the house. How am I supposed to know when I haven't been down there. Only thing I got to use is his report. I've told you over and over again.

Kondner Depo. at 143:19-144:3.

Notwithstanding his own admissions that he is not an expert in these fields, Kondner proposes to opine that moisture accumulation has caused fungal growth and structural deterioration of gypsum wallboard in the Murphy home. Without having expertise in any of these areas, however, Kondner's opinions on these matters are not based on scientific, technical, or specialized knowledge as required by *Daubert*, nor will they "assist the trier of fact to understand the evidence or to determine a fact in issue." *See* Fed. R. Evid. 702; *Daubert*, 509 U.S. 579. Therefore, the Court must exclude Kondner's testimony and opinions.

## II.    Kondner's Opinions Are Not Based on Sufficient Facts or Data

In addition to being unqualified as an expert, Kondner failed to rely on sufficient facts or data in his investigation. First and foremost, Kondner conducted no independent research into the performance of the Murphy exterior walls. Instead, he relied almost exclusively on the unreliable and unsupported conclusions of Bobby Parks. In short, Kondner's conclusions are not supported by the evidence he gathered.

It is well settled law that expert testimony must be "more than belief or unsupported speculation." *See Daubert*, 509 U.S. at 590. The Eleventh Circuit has likewise held that the

district court's role is to "ensure that the proposed expert testimony is 'relevant to the task at hand,' … i.e., that it logically advances a material aspect of the proposing party's case." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999), quoting *Daubert* (on remand), 43 F.3d at 1315. Therefore, the evidence must have a valid scientific connection to the disputed facts in the case. *Daubert*, 509 U.S. at 591. This connection has been appropriately denominated as "fit." *Id.* The Supreme Court has recognized that:

> *Conclusions and methodology are not entirely distinct from one another.* Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*Joiner v. General Electric*, 522 U.S. 136, 146 (1997); *see also Guillory v. Domtar Indus., Inc.*, 95 F.3d 1320 (5th Cir. 1996) ("Expert evidence based on a fictitious set of facts is just as unreliable as evidence based on no research at all. Both analyses result in pure speculation.").

"[T]he court is now obliged to screen expert testimony to ensure it stems from, not just reliable methodology, but also a sufficient factual basis and reliable application of the methodology to the facts." *Rudd v. General Motors Corp.*, 127 F. Supp. 2d 1330, 1336 (M.D. Ala. 2001).

Each of Kondner's conclusions is "connected to existing data only by the *ipse dixit* of the expert." *See Joiner*, 522 U.S. at 146. Kondner has been retained to render opinions in several manufactured housing cases involving claims of moisture problems resulting from the use of interior vapor barriers, but he admits that he has not actually seen a single home about which he is rendering opinions, and he has no field experience with Parks to assess the reliability or accuracy of Parks' investigations on which Kondner relies:

Q.   Have you seen any of the homes that you've rendered opinions on in the hot and humid climate litigation?

A.   I have not personally seen any of them.

…

Q.   Okay. Is it fair to say that you have relied on [Parks'] opinions in rendering yours?

A.   I've relied on his findings.

…

Q.   [H]ave you had any field experience with Mr. Parks or Mr. Bonney in the series of cases I'm questioning you about today, the hot and humid climate cases?

A.   Field experience with them on those? No, because I have not been to Alabama and I did not see the particular house.

…

Q.   I want to know what you know.

A.   I don't know anything about the house, physical house itself, because I was never there.  I have never seen it.  I have to rely on Bonney's report.

Kondner Depo. at 13:14-17, 14:10-12, 18:20-19:3, and 48:17-21.  Without having seen any of the homes or talked to the homeowners, *see id.* at 104:11-15, it is no surprise that Kondner produces reports that he admits are "virtually identical to one another," with the names, dates, and addresses being the only information specific to each home.  *See id.* at 147:7-10; Kondner Report; Kondner Reports in *Ford, Deese,* and *Strickland*, Exhibit H.  Indeed, Kondner's conclusions in his report about the Murphy home can be boiled down into just two opinions: 1) the interior vapor barrier caused moisture accumulation, resulting in "structural deterioration and … fungal (mold) growth within the wall structure," and 2) "Such construction in direct violation of accepted engineering practice … does not meet the performance requirements of 24 C.F.R. 3280.303(b)."  *See* Kondner Report at 6.

Kondner's claims are refuted not only by the HUD Code issues previously discussed, but they also suffer from a complete lack of physical evidence of problems in the walls themselves.  Kondner, of course, has no independent evidence of structural deterioration or fungal growth, and bases that conclusion solely on Parks' report.  *See, e.g.,* Kondner Depo. at 37:19-38:2 ("Q. Hypothetically speaking, if the court excludes Mr. Parks' mold opinions from this case, do you

have any basis within which to render your own mold opinions in this case? A. Not at present.") As explained in the separately filed *Daubert* motion to exclude Parks, Parks similarly has no valid evidence of structural deterioration. Rather, the results of testing by an independent accredited laboratory certified to test gypsum wallboard shows that the vinyl covered gypsum board from the Murphy home not only conforms to industry performance standards, but actually exceeds the industry standards by a considerable margin. *See* Tompos Declaration. Ignoring the actual physical condition of the walls in the Murphy home is a fatal flaw in Kondner's conclusions.

Given the "analytical gap between the data and the opinion proffered," this Court must take seriously its gatekeeper role and ensure that Kondner "has a sufficient factual basis" to support any conclusions before admitting them into evidence. *See Rudd*, 127 F. Supp. 2d at 1336; *Joiner*, 522 U.S. at 146. In this case, a review of the record makes clear that Kondner cannot pass the *Daubert* standard for admissibility of expert testimony. First, he lacks the qualifications necessary to offer the opinions contained in his report. Second, rather than conducting an independent investigation of the Murphy home that could support his conclusions, he instead bases his opinions on a "fictitious set of facts," which is itself based on the unreliable, unqualified and unsubstantiated opinions of Bobby Parks. *See Guillory*, 95 F.3d 1320 ("Expert evidence based on a fictitious set of facts is just as unreliable as evidence based on no research at all. Both analyses result in pure speculation."). As a result, Kondner's testimony and opinions are inadmissible.

## III. Kondner's Opinions Are Cumulative and Duplicative of Parks' Opinions

Finally, even if Kondner were to have the necessary qualifications (which he does not), and even if Kondner were to base his opinions on sufficient facts (which he does not), his

testimony still must be excluded because it is cumulative and duplicative of Parks' proposed testimony.

"Because of the powerful and potentially misleading effect of expert evidence, sometimes expert opinions that otherwise meet the admissibility requirements may still be excluded by applying [Fed. R. Evid.] Rule 403." *U.S. v. Frazier*, 387 F.3d 1244, 1263 (11th Cir. 2004) (internal citations omitted). Rule 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed. R. Evid. 403. If expert testimony is cumulative or duplicative, exclusion of the evidence is appropriate under Rule 403. *Frazier*, 387 F.3d at 1263.

In this case, Kondner's conclusions are exactly the same as Parks'. *See* Kondner Report at 6; Parks Report, Exhibit I, pp. 1-2. Furthermore, because Kondner conducted no independent research or analysis, the conclusions are based on the same data collected by Parks and offer no new information. The only reason Kondner is being called to testify is that Plaintiff is attempting to use an engineer to bolster the credibility of HVAC repairman Bobby Parks' unqualified and unsupported opinions regarding the design, Code compliance and performance of the Murphy walls.

Allowing Kondner's testimony and opinions into evidence would not assist the trier of fact in any way. His conclusions are already being offered by another proposed expert. His opinions are no different and offer no new data as compared to Parks' proposed testimony. The probative value of Kondner's testimony is even lower than that of Parks' proposed testimony because Kondner has no personal knowledge of the conditions of the Murphy walls. In short, the virtually non-existent probative value of Kondner's testimony is substantially outweighed by

high potential to confuse the jury through Plaintiff's attempt to cloak Parks' unqualified and unsupported opinions with an engineer's blessing. Consequently, Kondner's opinion and reports must be excluded from evidence under Rule 403.

## CONCLUSION

For the reasons set out in this brief, Defendant Southern Energy Homes, Inc., respectfully moves this Court to exclude the testimony and opinions of Robert Kondner.

 */s/Thomas W. Thagard III*
Lee E. Bains, Jr. (BA1005)
Thomas W. Thagard, III (THA006)
Edward S. Sledge, IV (SLE008)
Attorneys for Southern Energy Homes, Inc.

**OF COUNSEL:**

**MAYNARD, COOPER & GALE, P.C.**
1901 Sixth Avenue North
2400 AmSouth/Harbert Plaza
Birmingham, AL 35203
(205) 254-1000 (Telephone)
(205) 254-1999 (Facsimile)
E-mail: lbains@maynardcooper.com
E-mail: tthagard@maynardcooper.com
E-mail: sledge@maynardcooper.com

W. Scott Simpson
RITCHEY & SIMPSON, PLLC
3288 Morgan Drive, Suite 100
Birmingham, Alabama 35216-3084
205.876.1600 (Telephone)
205.876.1616 (Facsimile)
E-mail: wssimpson@ritcheysimpson.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 8, 2007 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

**Carter Gibson Vance**
E-mail: gibson.vance@beasleyallen.com

**Charles Lance Gould, Esq.**
E-mail: lance.gould@beasleyallen.com

*/s/Thomas W. Thagard III*
Of Counsel