```
                            kondnerdr.txt
0001
 1              IN THE UNITED STATES DISTRICT COURT
 2             FOR THE MIDDLE DISTRICT OF ALABAMA
 3                      Northern Division
 4    - - - - - - - - - - - - - - - -+
                                     |
 5    HAROLD KELLY MURPHY,           |
                                     |
 6              Plaintiff,           |
                                     |
 7      vs.                          |   Case No.:
                                     |   2:06-CV-618-MEF
 8    SOUTHERN ENERGY HOMES, INC.,   |
      et al,                         |
 9                                   |
                Defendants.          |
10    - - - - - - - - - - - - - - - -+
11                     Videoconference
12          Deposition of Dr. Robert L. Kondner, P.E.
13                    Washington, D.C.
14               Friday, December 21, 2007
15                      10:00 a.m.
16
17
18
19
20
21    Job No. 22-118855
22    Pages 1 - 174
23    Reported by:  Laurie Bangart-Smith
0002
 1                    Deposition of
 2             Dr. Robert L. Kondner, P.E.
 3
 4    Held at the offices of:
 5           L.A.D. REPORTING
             1100 Connecticut Avenue
 6           Suite 850
             Washington, D.C. 20036
 7           (800)292-4789
 8
 9
10
11
12
13
14
15
16
17           Taken pursuant to the Federal Rules of Civil
18    Procedure, by notice, before Laurie
19    Bangart-Smith, Registered Professional Reporter
20    and Notary Public in and for the District of
21    Columbia.
22
23
0003
 1                  A P P E A R A N C E S
 2    ON BEHALF OF THE PLAINTIFF:
 3           JON D. PELS, ESQUIRE
 4           PELS, ANDERSON & LEE, L.L.C.
                                            Page 1
```



EXHIBIT
D

kondnerdr.txt

```
 5              4833 Rugby Avenue
 6              Fourth Floor
 7              Bethesda, Maryland 20814
 8              (301)986-5570
 9
10    ON BEHALF OF THE DEFENDANT:
11              R. SCOTT SIMPSON, ESQ. (via videoconference)
12              RITCHEY & SIMPSON
13              3288 Morgan Drive
14              Suite 100
15              Birmingham, Alabama 35216
16              (205)876-1600
17
18
19
20
21
22
23
```
0004
```
 1                      EXAMINATION INDEX
 2                                                      PAGE
 3    EXAMINATION BY MR. SIMPSON . . . . . . . . . . .     6
 4    EXAMINATION BY MR. PELS . . . . . . . . . . . .    160
 5    REDIRECT BY MR. SIMPSON . . . . . . . . . . . .    162
 6
 7
 8
 9                      E X H I B I T S
10                  (Attached to the Transcript)
11    DEPOSITION EXHIBIT                                  PAGE
12    No. 1      Notice of deposition duces tecum           7
13    No. 2      Kondner's expert report, 10/18/07         74
14
15
16
17
18
19
20
21
22
23
```
0005
```
 1                    P R O C E E D I N G S
 2              MR. SIMPSON:  The usual stipulations okay,
 3    Jon?
 4              MR. PELS:  That's fine, Scott.  Do you mind
 5    if I just interpose a quick objection?
 6              MR. SIMPSON:  Sure.
 7              MR. PELS:  Okay.  Just on the -- I noticed
 8    the duces tecum.  I know we've got Beasley Allen
 9    involved and I'm involved.  We just got the duces
10    tecum part of this deposition, so I object based
11    on timeliness and some of them are overbroad.
12              That said, we believe you have the learned
13    treatises, a lot of those documents with you, but
14    I had him bring everything related to this case I
15    think that's possibly responsive.  We had them
16    brought today, and I thought, you know -- like
17    you said, I think we'll be able to work it out,
18    but I just wanted to put that out there.
19              MR. SIMPSON:  Okay.  Well, for the record,
```
                              Page 2

kondnerdr.txt

```
20       this is the second time this Notice has been
21       served, and I think you had notice of it for
22       about three or four weeks, but that being said, I
23       trust we can work if out and we won't have any
0006
1        problem.
2             MR. PELS:  Okay.
3                  DR. ROBERT L. KONDNER, P.E.,
4        having been first duly sworn, testified upon his oath
5        as follows:
6             EXAMINATION BY COUNSEL FOR DEFENDANT
7        BY MR. SIMPSON:
8             Q    Dr. Kondner, we have not met before today, I
9        don't think.
10            A    No, not that I recall.
11            Q    All right.  I'd like to start with some
12       background information from you if I may, sir.
13                 MR. SIMPSON:  Do you have a -- Jon, do you
14            have a CV or something on your side you could
15            attach as an exhibit for the deposition?
16                 THE WITNESS:  I don't know whether I brought
17            one or not.  It's the same thing for the Deese
18            deposition, exactly the same.
19                 MR. SIMPSON:  All right.  Madam Court
20            Reporter, will you do me a favor.  Do you have
21            the deposition notice for this case?
22                 MR. PELS:  I brought it, Scott.
23                 MR. SIMPSON:  All right.  May I ask that
0007
1        that be attached as Exhibit 1.
2                 (Discussion was held off the record.)
3                 MR. SIMPSON:  I will have my legal assistant
4            provide that, Laurie, to you at another fax that
5            you can give me later, and we can just agree to
6            call that Exhibit 1 if that's all right.
7                 (Exhibit No. 1 was marked for identification
8            and attached to the deposition transcript.)
9        BY MR. SIMPSON:
10            Q    Dr. Kondner, would you give me a brief
11       discussion of your professional history, starting with
12       your most recent job.
13            A    The most recent job?
14            Q    Yes.
15            A    Well, yesterday I -- I'm self-employed.
16            Q    Okay.
17            A    Yesterday I went out and proof-rolled a
18       construction site in East Baltimore.  Let's see.
19            Q    What sort of professional employment have
20       you had in your career?
21            A    Well, I've been a professor at Johns
22       Hopkins, Northwestern, University of Maryland, a
23       professor of engineering physics at Louisville
0008
1        College, and I've worked at the universities since
2        receiving my degrees.  I've done research, nuclear
3        weapons effects, U.S. Army Corps of Engineers, various
4        highway projects, and that type of thing.
5             Q    How long were you practicing in academia?
6        How many years?
7             A    Well, probably since the 1950s, somewhere in
8        the 1950s.
9             Q    May I ask your date of birth and your Social
10       Security number, please, sir.
```

Page 3

kondnerdr.txt
```
11        A    The date of birth is 8/9/32.
12             MR. PELS:  I'll let him give you the Social.
13        For the record, in Federal Court, at least up
14        here, that information is not to be disseminated,
15        for obvious reasons, so . . .
16             MR. SIMPSON:  No, that's fine.  I agree.
17             THE WITNESS:  Give it to him?
18             MR. PELS:  If you don't mind.
19             THE WITNESS:  I don't care.  It's
20        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.
21   BY MR. SIMPSON:
22        Q    Don't take offense at any of these
23   questions.  Have you ever been arrested in your life?
0009
 1             MR. PELS:  Objection.
 2             You can answer.
 3             THE WITNESS:  No.
 4   BY MR. SIMPSON:
 5        Q    Any bankruptcies?
 6        A    No.
 7        Q    Have you ever worked outside of academia
 8   other than for yourself as a consultant?
 9        A    I don't think so.
10        Q    And how many lawsuits have you consulted on
11   in your professional career?
12        A    You mean cases that have been settled or
13   ones that have gone to court?
14        Q    Just all the times lawyers have hired you to
15   be an expert witness.  I just would like your judgment
16   as to how many cases that would be.
17        A    I don't know.  Maybe 50, 40, somewhere in
18   that ballpark.
19        Q    And were those all in recent years, or has
20   that been over the 50 plus year career that you've
21   had?
22        A    It's been over the career.
23        Q    The gentleman seated next to you, Mr. Pels;
0010
 1   how do you know him?
 2        A    I worked with him on a suit dealing with
 3   manufactured housing.
 4        Q    And was that a case involving soil anchor
 5   systems and issues related to tie-downs?
 6        A    Partly.
 7        Q    What else was it involving?
 8        A    Support.  Footing support.  Pier support.
 9        Q    Basically it was a series of cases involving
10   the way mobile homes are affixed to the ground,
11   correct?
12        A    Affixed to the ground and the effects of
13   affixing it to the ground.
14        Q    And how many actual cases was that?
15        A    I think that might have been three.
16        Q    All right.  How much money have you received
17   from the Pels firm and/or the Beasley firm in
18   connection with any litigation?
19        A    Gee, I don't really know.  I would have to
20   go back and examine that, come up with a figure.
21             MR. SIMPSON:  Jon, can we have an agreement,
22        since that's sort of standard Rule 26 stuff, to
23        have you supplement that in the next week or ten
0011
 1        days?
```

kondnerdr.txt

```
 2              MR. PELS:  Absolutely.  Can you get it to me
 3         in that time frame?
 4              THE WITNESS:  Sure.
 5              MR. PELS:  Yes.
 6              MR. SIMPSON:  Okay, thank you.
 7              MR. PELS:  Sure.
 8    BY MR. SIMPSON:
 9         Q    Dr. Kondner, other than the three tie-down
10    cases -- I'm going to call those "tie-down cases" if
11    that's okay -- that you worked on with the Pels firm,
12    how many other manufactured housing cases have you
13    worked on in your career?
14         A    I don't know that I've worked on any.  There
15    may be some buildings that -- houses that I have done
16    pre-construction surveys on that may have been
17    manufactured housing.
18         Q    How many homes have you been retained to
19    give opinions on or to evaluate in connection with
20    this series of litigation?  And by that I mean the
21    wallboard litigation.
22              MR. PELS:  I'd object to the
23         characterization, form and foundation of
0012
 1         wallboard, but you can answer.
 2              MR. SIMPSON:  Jon, if we can agree on a
 3         term, I don't care what we call it.  I just want
 4         him to understand where I'm coming from.
 5              MR. PELS:  Okay.  Maybe we can call it the
 6         "hot humid climate litigation."
 7              MR. SIMPSON:  Okay.
 8              THE WITNESS:  As far as I am aware, it's the
 9         three:  Deese, Murphy and Ford.
10    BY MR. SIMPSON:
11         Q    Have you been paid any money in connection
12    with those cases?
13         A    Deese, but I don't know how much it adds up
14    to.
15         Q    How do you charge?  What's the basis of your
16    fee?
17         A    I go by an hourly basis.
18         Q    And what is your hourly rate, sir?
19         A    It's $150 an hour unless it's involving
20    litigation.  Then it's double.
21         Q    Are you currently a professional engineer?
22         A    Yes.
23         Q    In what states are you licensed currently?
0013
 1         A    State of Maryland.
 2         Q    Have you ever traveled to Alabama in your
 3    career?
 4         A    Yes, I have.
 5         Q    When?
 6         A    Well, I know I've worked on a project in
 7    Mobile and Montgomery, and I've worked on some things
 8    that are defense-oriented over the years related to
 9    things at Huntsville and some of the testing labs for
10    equipment in nuclear power plants.
11         Q    Have you ever traveled to Alabama in
12    connection with the hot and humid climate litigation?
13         A    This particular litigation?  No.
14         Q    Have you seen any of the homes that you've
15    rendered opinions on in the hot and humid climate
16    litigation?
```

Page 5

kondnerdr.txt

```
17        A    I have not personally seen any of them.
18        Q    Have you seen or relied on any other expert
19   reports in connection with the opinions you intend to
20   rely on in the Murphy case?
21        A    Yes.
22        Q    Which reports have you seen and do you
23   intend to rely on?
0014
1         A    Bobby Parks' report.
2         Q    Which one?  He has two.  Are you aware of
3    that?
4         A    He has two that I'm aware of in the Ford
5    case, and I'm aware of one in the Murphy case.
6         Q    So you've only seen his first report in
7    Murphy?
8         A    Yes.  Well, it's either the first or the
9    second, but I haven't seen two of them.
10        Q    Okay.  Is it fair to say that you have
11   relied on his opinions in rendering yours?
12        A    I've relied on his findings.
13        Q    What specific findings have you relied upon
14   in rendering your opinions?
15        A    Well, I'd have to go through his report to
16   pick out everything, but if you want a
17   generalization . . .
18        Q    I'm not going to pin you down.  I just want
19   to know what impressions you came away from his report
20   with that you think are relevant to yours.
21        A    Well, the Murphy report is that there is
22   moisture within the walls, at least some of the walls,
23   and that there's mold growth within the walls.
0015
1         Q    Do you know how Mr. Parks determined there
2    was excess moisture in the walls?
3         A    He used a moisture meter.
4         Q    Do you know what relative readings he
5    reached?
6         A    In the Murphy case?
7         Q    Yes, sir.
8         A    I'd have to look at the report.  I think
9    he -- it's either the Ford report or the Murphy report
10   I think he's got moistures as high as I think
11   30 percent.
12        Q    Do you know if that's a relative or absolute
13   moisture content?
14        A    I'd have to go back and look at his report.
15        Q    Why don't you do that, because I've got some
16   questions about that.  I e-mailed all of your side's
17   reports to you guys last night and yesterday afternoon
18   to make sure you had them.
19             MR. PELS:  Oh, yeah.  Scott, for the record,
20        I think you e-mailed us the Deese report.  I
21        don't know if you got our reply e-mail.
22             MR. SIMPSON:  Well, on Kondner's report, but
23        I thought you had all the Murphy stuff.
0016
1              MR. PELS:  We did, no, but I'm talking
2         about, you know, Kondner's, I think you guys
3         accidentally sent us his Deese report.
4              (Discussion was held off the record.)
5    BY MR. SIMPSON:
6         Q    Dr. Kondner, let me refer you to Page 3 of
7    Mr. Parks' report.
```

kondnerdr.txt

```
 8        A    Okay.  Right down at the bottom --
 9        Q    Before we get into that, do you have any
10   idea what Mr. Parks' professional credentials are that
11   would give him the ability to render expert opinions
12   in court?
13        A    As far as I know, it's experience, his
14   experience.
15        Q    Do you know what kind of education he
16   possesses?
17        A    No, I do not.
18        Q    If I told you he was a high school graduate,
19   would that surprise you?
20        A    No.
21        Q    If I told you he didn't have any college or
22   professional credentials such as yourself, would that
23   surprise you?
0017
 1             MR. PELS:  Objection to form and foundation.
 2        You can answer.
 3             THE WITNESS:  No.  An expert is by virtue of
 4        education and training or experience or a
 5        combination thereof.
 6   BY MR. SIMPSON:
 7        Q    Have you met Mr. Bonney?
 8        A    Yes, I have.
 9        Q    Do you know what sort of education he
10   possesses?
11        A    No, I do not.
12        Q    How many times have you met Mr. Parks?
13        A    Two or three, I think.
14        Q    And what's the sum total of your encounters
15   with him?  How long did you spend talking to him?
16        A    Oh, talking to him and in discussions with
17   him, maybe -- and experience in the field with him,
18   several days, I guess.
19        Q    What experience in the field have you had
20   with Mr. Parks?
21        A    I was in a manufactured unit in the general
22   Baltimore area where he measured and took photographs
23   and -- measured temperatures and took his photographs.
0018
 1        Q    Was that a moisture-related case?
 2        A    That was -- well, there's moisture, but it's
 3   not necessarily a moisture-related case.  It's a
 4   support case, tie-down and pier footing.
 5             MR. PELS:  Scott, if you want, I can help
 6        you out, but I don't want to -- I can interject
 7        what we used him for.
 8             MR. SIMPSON:  No, that's okay.  Go ahead.
 9             MR. PELS:  The tie-down, what you were
10        calling the tie-down case, the foundation case,
11        part of it is the impact it has on the actual
12        structure of the home as well, and so Dr. Kondner
13        was talking about Bobby Parks was one of -- we
14        had about nine or ten experts, I think, in that
15        case, but he was one of them, to show kind of the
16        structural deterioration of the walls, et cetera,
17        related to the installation issues.
18             MR. SIMPSON:  Okay.
19   BY MR. SIMPSON:
20        Q    Dr. Kondner, have you had any field
21   experience with Mr. Parks or Mr. Bonney in the series
22   of cases I'm questioning you about today, the hot and
```

kondnerdr.txt

23   humid climate cases?
0019
1          A     Field experience with them on those?  No,
2     because I have not been to Alabama and I did not see
3     the particular house.
4          Q     When's the last time you've been to Alabama?
5          A     I really don't know.  I could probably give
6     you an estimate.  Probably about ten years ago.
7          Q     Let me refer you to Page 3 of Mr. Parks'
8     report.  Down at the bottom of the report do you see
9     where he's catalogued his moisture readings there?
10         A     Yes.
11         Q     Okay.  Do you have a judgment as to whether
12    those are absolute or relative moisture readings?
13         A     He says, "Typical moisture content within
14    the interior partition walls of this home were in the
15    ten percent, 12 percent range.  Consistent readings
16    within Murphy's perimeter gypsum walls were in the
17    25 percent to 40 percent range."
18               He doesn't specify it, but moisture content
19    means moisture content.  To me it's an absolute value.
20         Q     So you think those are absolute values?
21         A     I think they are.  I haven't seen anything
22    other than that, unless he defines it in here a little
23    better.
0020
1          Q     Do you know how one is supposed to obtain
2     absolute moisture values in gypsum?  Do you know what
3     process a person goes through to do that?
4          A     I don't know the specific -- I would think
5     one would have to take a sample of the material.
6          Q     And do what with it?
7          A     Determine its moisture content.
8          Q     How would you do that, though?  What do you
9     physically do?
10         A     You physically would have to take it and
11    heat it, weigh it, weigh it natural, the way you've
12    taken a sample.  Then you would heat it and then you
13    would reweigh it, and you would take the -- there are
14    numbers of different moisture contents, and in some
15    engineering work it's done different than in others.
16    In geotechnical work you can have moisture contents
17    that can be greater than a hundred percent.  In a
18    geologic sense or as people would normally think of
19    moisture content, the maximum you would have would be
20    a hundred percent.  So, therefore, it would be a
21    ratio, it would be a ratio of the water to the total
22    weight.
23         Q     So is it your opinion that he did that here?
0021
1          A     I assume he used a meter here.  Now, I don't
2     know the details of the meter nor how the meter is
3     calibrated or anything of that sort.
4          Q     Can you get a good absolute moisture reading
5     from a meter?
6          A     No.
7               MR. PELS:  I'm going to object.  Dr. Kondner
8          is not here to opine about moisture meter
9          readings.
10              MR. SIMPSON:  Well, he's relied on this
11         report, so I have a right to know what he knows
12         about it.
13              MR. PELS:  And I'm going to let him answer,

kondnerdr.txt

```
14         but I'm going to interpose that objection.
15             MR. SIMPSON:  Okay.
16   BY MR. SIMPSON:
17         Q    So do you know whether this is an absolute
18   or relative, or are you just guessing?
19             MR. PELS:  Objection; form and foundation.
20             You can answer.
21             THE WITNESS:  Well, if it's relative, it has
22         to be relative to something, and he hasn't
23         specified here what that relative is.
0022
1    BY MR. SIMPSON:
2          Q    So which is it, Doctor; is it relative or
3    absolute?
4          A    He doesn't define it.
5          Q    Well, what did you take away from the
6    report?  What do you think it is?
7          A    Well, whether it's absolute or relative, the
8    value in the gypsum, the perimeter gypsum walls is two
9    to three times greater than in the interior
10   partitions.  So in that sense it would be a relative,
11   but it's two to three times higher.  That's
12   significant.
13         Q    Well, is it absolute or relative?  Can you
14   give me an answer on that?
15         A    It doesn't make any difference.
16         Q    I don't care whether it makes a difference.
17   I want to know what you think this report says.  Is it
18   absolute or relative?
19             MR. PELS:  Objection; asked and answered.
20             You can answer again.
21             THE WITNESS:  I don't know.
22   BY MR. SIMPSON:
23         Q    Okay.  Let me ask you this:  Are you aware
0023
1    of any scale promulgated by the gypsum industry or any
2    other authoritative source which sets forth a standard
3    which says X amount of moisture is too much or not
4    enough or just right?
5          A    I'm not aware of that standard.
6          Q    Is it a fair statement to say that you can't
7    say with any degree of scientific certainty that the
8    numbers that Mr. Parks recorded in this report
9    relative to moisture don't violate any standard of
10   care that you know of?
11             MR. PELS:  Objection; form and foundation,
12         asked and answered.  He's already said it's two
13         to three times higher.
14             You can answer again if you want.
15             MR. SIMPSON:  Jon, please don't coach him.
16   BY MR. SIMPSON:
17         Q    Do you know whether these numbers violate
18   any standard of care?
19         A    Well, in looking at these numbers and
20   realizing that the perimeter gypsum walls are two and
21   a half to three times more than they are on the
22   interior partitions of the wall and the fact that he
23   has detected mold growth within the walls tells me
0024
1    that there is a problem here with moisture, and the
2    values tell you that.
3          Q    Well, first let me ask you this:  Do you
4    know whether the ratio is direct, whether it's a
```

Page 9

kondnerdr.txt

```
 5   linear number or whether it's non-linear, when you go
 6   from one wall to the next on a relative or absolute
 7   scale?
 8        A    Well, either way.  Either way.  Look.  Ten
 9   percent and 25 percent, okay, that's two and a half
10   times in the perimeter walls.  Now, I don't care
11   whether it's relative or absolute.  It's two and a
12   half times higher.  You can't dispute that.
13        Q    Sir, isn't that the case if the numerical
14   relationship is linear?
15        A    Why would it be --
16        Q    Do you know the difference between linear
17   and non-linear?
18        A    Oh, I certainly do.
19        Q    All right.  If the relationship is
20   non-linear, you can't say it's two and a half times,
21   can you?
22        A    What do you mean "non-linear"?  I don't
23   think it's non-linear.
0025
 1        Q    Do you have any basis to say that?
 2        A    Well, he's given me moisture contents.  If
 3   he had some kind of special scale that he's measuring
 4   these moisture contents on, he would have had to put
 5   that in here.  It doesn't say it, so, therefore, the
 6   only conclusion you can come to is that they are
 7   linear.
 8        Q    So you think it's linear?
 9        A    Yeah.  Yes, I do.  I think it's two and a
10   half times higher for the ten percent and the
11   25 percent.  The 12 percent and the 40 percent, that's
12   over three times higher.
13        Q    Other than the relationship from the
14   interior to the exterior walls and your problem with
15   that, is there any other authoritative source you can
16   cite me to that would stand for the proposition that
17   any of these numbers are a violation of any standard
18   of care anywhere?
19        A    Well, the fact that he has detected mold,
20   fungal growth, within these walls shows that there is
21   a problem with this moisture on the interior gypsum
22   walls.
23        Q    We'll get to the mold in a minute.  I want
0026
 1   to get my question answered.  Are you aware of any
 2   standard which provides that ten percent, 12 percent,
 3   25 or 40 percent moisture is a violation of any
 4   standard of care?  I just want to get that question
 5   answered.
 6            MR. PELS:  Objection.
 7            You can answer.
 8            THE WITNESS:  I think the fact that they're
 9        two and a half to three times greater, that ratio
10        says to me that there is something wrong here
11        with the standard of care.
12            MR. SIMPSON:  Jon, will you please instruct
13        the witness to answer my question.  We're going
14        to be here all day if he keeps being evasive.
15   BY MR. SIMPSON:
16        Q    I just want to know, sir:  Are you aware of
17   any standard of care which says that any of these
18   values are indicative of failure or defect in the
19   gypsum wall industry?
```

Page 10

kondnerdr.txt
20       A    How do you define "standard of care"?
21       Q    Well, you tell me.  Do you know what a
22  standard of care is?
23       A    You tell me.  You're asking the question.  I
0027
1   don't know what your definition of standard of care
2   is.  Which standard of care?  You tell me what
3   standard of care you're talking about.
4        Q    Well, that's my question to you.  Do you
5   know any?  Do you know any standard of care that
6   relates to gypsum and moisture content anywhere in the
7   universe?
8        A    Well, in the literature that you have in
9   your possession I believe it talks about that effect.
10  I don't have it in front of me here, but go back and
11  look.
12       Q    Sir, are you an exert on standard of care
13  with regard to moisture content in gypsum?
14       A    No, I wouldn't say I was.
15       Q    And the truth is, without going and doing
16  research, you don't know sitting here today whether
17  any of these ranges of moisture violate any standard
18  of care, correct?
19            MR. PELS:  Objection; form and foundation,
20       mischaracterization.
21            You can answer.
22            THE WITNESS:  It is my opinion that when you
23       have these moisture contents that are two to
0028
1        three, two and a half to three times difference
2        between an interior wall and a perimeter wall,
3        that you've got a problem with moisture, and the
4        fact that you've got mold growth just
5        substantiates it.  You don't get the mold growth
6        unless you have a standard of moisture which
7        exceeds some authoritative value.
8   BY MR. SIMPSON:
9        Q    Doctor, we'll get to your mold opinion in a
10  minute.
11       A    The two go together.
12       Q    I want to get an answer to my question.
13            MR. SIMPSON:  And Jon, I'd ask you to
14       instruct your witness to answer.  It's not hard.
15  BY MR. SIMPSON:
16       Q    I just want to know:  Are you aware of any
17  standard of care in the industry which provides that
18  any of these ranges of moisture content violate a
19  known standard of care.  Yes or no; do you know?
20            MR. PELS:  Let me object.  I mean, Scott, I
21       think he's answering your question based on what
22       he believes, and . . .
23            MR. SIMPSON:  Jon, he is just giving me
0029
1        garbage about what he thinks Bobby has said.  I
2        want to know what he thinks is an authoritative
3        source that provides that any of these ranges
4        violate any standard of care, and I'd like my
5        answer.
6             MR. PELS:  Well, Scott, first of all, I
7        don't think he's giving you "garbage."  I object
8        to that term, and, you know, he's relying on
9        Mr. Parks' and Bonney's reports, and he's telling
10       you what his opinion is based on that, and, you

kondnerdr.txt

```
11          know, he's here to give you the physics of what's
12          happening in these walls.
13  BY MR. SIMPSON:
14          Q    Well, I still want my answer.  Tell me what
15  standard of care any of these moisture readings
16  violate, sir, and I don't want do hear because they're
17  related to each other.  I want to know authoritative
18  treatise, book, page, anything you're aware of sitting
19  here today right now.
20               MR. PELS:  Well, Scott, again he did say
21          that you have in possession all those learned
22          treatises that we provided you.
23               MR. SIMPSON:  Jon, I'm not going to go play
0030
1          hide the peanut with your 80-page exhibit.  I
2          want to know what this witness knows, and I'm not
3          going to sit here and let him go read for an
4          answer.  He either knows the answer or he doesn't
5          know the answer.
6               MR. PELS:  I don't think that's fair.
7  BY MR. SIMPSON:
8          Q    What is the answer?
9               MR. PELS:  Scott, let's compare him to some
10          of the responses I've gotten from your experts
11          which were way worse, including your 30(b)(6).
12          The fact of the matter is he's giving you
13          answers.  You may not like the answers, but he's
14          providing you with his answers.  I don't know
15          what else you want him to do.
16  BY MR. SIMPSON:
17          Q    First of all, there has been no 30(b)(6) in
18  this case, and I resent your accusation.  Secondly,
19  I'd like to know, Dr. Kondner, what standard of care
20  says that 10, 12, 25 or 40 percent moisture readings
21  is a problem.  I'm waiting for your answer.
22               MR. PELS:  I'm going to object for the
23          record and let him answer again if he wants.
0031
1               THE WITNESS:  I would say the 25 to
2          40 percent range is poor.
3  BY MR. SIMPSON:
4          Q    And what authoritative work are you relying
5  on for that statement?
6          A    I can't quote you an authoritative source.
7  That's my feeling based on my experience.  That's my
8  answer to your question.
9          Q    Do you know what "ASTM" stands for?
10          A    Yes, I do.
11          Q    What does it stand for?
12          A    American Society of Testing Materials.
13          Q    Do you know what, if any, ASTM standard
14  applies to moisture content in gypsum?
15          A    I can't quote you a standard.  If you'd like
16  to show me one, I'd be happy to read it and translate
17  it for you.
18          Q    You don't know if there even is one, do you?
19          A    I think there probably is one.  There are
20  many of them.  There are whole volumes of them.
21          Q    Have you ever had direct experience with one
22  that relates to moisture content?
23          A    Any specification that relates to moisture
0032
1  content?
```

kondnerdr.txt

```
 2        Q    ASTM standard in gypsum.
 3        A    Oh, in gypsum.  I can't recall any.  I may
 4   have seen it; I may not have seen it.  I don't know.
 5        Q    Are you aware of any other ASTM standards
 6   that are utilized for testing the integrity of gypsum
 7   products?
 8        A    No, I'm not, but I -- in some of the
 9   literature I looked at, I know that there is one that
10   deals with that, because I've seen it, but I don't
11   recall the details.
12        Q    Do you know what a nail pull test is?
13        A    A nail pull test?
14        Q    Yes, sir.
15        A    Well, it obviously has to do with the
16   resistance -- I don't know the spec, but I would think
17   that if that's the title of it, then it must be the
18   force to pull out a nail.
19        Q    Are you guessing?
20        A    That's just my opinion.
21        Q    Have you ever -- do you have any familiarity
22   with any nail pull test in the gypsum industry?
23        A    No, I haven't.
0033
 1        Q    Do you have any familiarity at all with a
 2   test dealing with compaction or compression in the
 3   gypsum industry?
 4        A    Not in the gypsum industry.
 5        Q    Do you have any familiarity with anything
 6   called a flex test in the gypsum industry?
 7        A    No, but I've experienced other flex tests.
 8        Q    Hypothetically speaking, if we removed a
 9   large area of exterior wallboard from the exterior
10   wall from this home and had it tested by an ASTM
11   approved lab, and that lab came back with testing
12   results saying that the gypsum was in very good
13   condition, no problem, could you explain that kind of
14   result in relation to what Mr. Parks has said?
15             MR. PELS:  Objection to form and foundation.
16        Also can you be more specific about the time
17        frame limitation?
18             THE WITNESS:  How about the test, type of
19        test?
20   BY MR. SIMPSON:
21        Q    The test I just described.
22        A    I'd like to have more details of it, such as
23   the sample, the dimensions, the loading, the loading
0034
 1   frame, the deflections.  Apparently you don't know any
 2   of that.
 3        Q    The fact is, sir, you're not even familiar
 4   with any of those tests, are you?
 5        A    Not on gypsum.
 6        Q    So you wouldn't be an expert on that, would
 7   you?
 8             MR. PELS:  Objection.
 9   BY MR. SIMPSON:
10        Q    Sir?
11        A    But if I were given the results and if I
12   were given the tests and a test form, I sure could
13   analyze it and give you some results on it, because it
14   goes to basic engineering properties.  It goes to the
15   rheologic properties of the material, the way the test
16   is performed, whether it's static, dynamic, so forth,
```

Page 13

kondnerdr.txt

```
17    and I certainly could interpret that for you.
18         Q    But you've never done the test, never seen
19    it done, right?
20         A    Not that I recall.
21         Q    Now, you're not a mold expert, are you?
22         A    No, I wouldn't classify myself as a mold
23    expert.
```
0035
```
 1         Q    Have you had any specialized training in
 2    mold?
 3         A    No, I don't believe so.  I try to avoid
 4    mold.
 5         Q    Have you ever published on any area
 6    involving mold?
 7         A    No, I haven't, but I am aware that it's
 8    unhealthy.
 9         Q    Do you know anything else about it?
10         A    I know it could lead to some very serious
11    problems, including the total removal of homes that
12    are infested with it.
13         Q    But you're not an expert?
14         A    No, I'm not an expert in it.
15         Q    In fact, if you turn a few pages more to --
16    let's say turn to the back of Mr. Parks' report, Page
17    3 of 6, 2 of 6, 1 of 6.  Do you see those pages?
18         A    What do you want; 3 of 6?
19         Q    3 of 6.  That's fine.
20         MR. PELS:  Are you on the Galson Labs,
21    though, Scott?
22         MR. SIMPSON:  Yes, sir.
23         MR. PELS:  Okay.
```
0036
```
 1         THE WITNESS:  I'm there.
 2    BY MR. SIMPSON:
 3         Q    All right.  Do you know anything about these
 4    molds on this page?
 5         A    What do you mean by do I know anything about
 6    them at all?  I can read the names.  The names are
 7    here and the spore counts are here.
 8         Q    But I'm saying are you qualified to
 9    interpret that data in any way.
10         A    Medically, no.
11         Q    Well, in any sense.
12         A    What do you mean by "any sense"?  I simply
13    look at the figures here, and some of them are quite
14    high and some of them are negligible.
15         Q    But aren't you guessing?  You don't know
16    what high, medium or low is on any relative scale, do
17    you?
18         A    They look high to me.  I wouldn't want to be
19    breathing those spores.
20         Q    Do you realize that Mr. Parks has testified
21    that none of these spores are making their way into
22    the indoor ambient air?
23         MR. PELS:  Objection; form and foundation.
```
0037
```
 1         You can answer.
 2         THE WITNESS:  Wait a minute.  Living room
 3    wall cavity.  I don't know that he said that
 4    they're in the interior of the house, in the
 5    living side of the house.
 6    BY MR. SIMPSON:
 7         Q    Can you cite me to any standard of care that
```

kondnerdr.txt

```
 8    you know of which provides that any mold count or
 9    concentration above a certain number violates the
10    standard of care?
11         A    Oh, I would imagine there is one, but I
12    don't know it.
13         Q    But you think there is one?
14         A    I think there is.
15         Q    Have you ever heard of the standard and
16    reference guide for professional mold remediation
17    which is designated IICRCS520?
18         A    I'm not familiar with it.
19         Q    Hypothetically speaking, if the court
20    excludes Mr. Parks' mold opinions from this case, do
21    you have any basis within which to render your own
22    mold opinions in this case?
23              MR. PELS:  Objection; form and foundation.
0038
 1              You can answer.
 2              THE WITNESS:  Not at present.
 3    BY MR. SIMPSON:
 4         Q    You don't know much about the HUD code, do
 5    you?
 6              MR. PELS:  Objection; form and foundation.
 7              THE WITNESS:  I'm familiar with the HUD code
 8         and I've read the HUD code.  If you would care to
 9         point me out a section to it, I'd be happy to
10         take a look at it for you.
11    BY MR. SIMPSON:
12         Q    Are you an expert in the HUD code?
13         A    No.  I'm an engineer, but the HUD code deals
14    with engineering.
15         Q    Have you ever designed a HUD code home in
16    your career?
17         A    No, I have not.
18         Q    Do you know what a DAPIA is?
19         A    Yeah, it's the -- let's see -- the design
20    approval of inspection, primary inspection agent or
21    agency dealing with design.
22         Q    Do you know what an IPIA is?
23         A    Well, that would have to be the interior
0039
 1    inspection.  It's an inspection.
 2         Q    Do you know anything about it?
 3         A    Such as?
 4         Q    Tell me what you know about it.  What do you
 5    know about IPIA?
 6         A    Well, I don't know much about it.  I do
 7    recall seeing it in the HUD code as well as the DAPIA.
 8         Q    Do you know the process from design to
 9    completed construction in a manufactured home?  Are
10    you familiar with that?
11         A    The process from what, from design to what?
12         Q    From initial design to completed
13    construction.  Can you walk me through that?
14         A    I would not walk you through step by step of
15    that process, but that is a construction process, and
16    in that construction process you have to have various
17    inspections.  You have to meet certain criteria.  You
18    have to meet these HUD code requirements.
19         Q    Do you have any specific information other
20    than just your speculation on that?
21              MR. PELS:  Objection; form and foundation.
22              You can answer.
```

kondnerdr.txt

```
23              THE WITNESS:  That's professional
0040
 1         experience.  I mean when you build something, I
 2         don't care if's a building, a stick building or
 3         whatever it is, you're going to have inspections.
 4         You've got to meet codes.
 5    BY MR. SIMPSON:
 6         Q    Tell me what they are in a manufactured home
 7    setting.
 8         A    Go look at the HUD code and you'll find it.
 9         Q    Sir, you've been tendered as an expert.  I
10    get to ask you what you know about it, and it doesn't
11    sound like you know much.
12              MR. PELS:  Objection; form and foundation,
13         characterization.
14              THE WITNESS:  I'm not a HUD code expert, but
15         I am an engineer, and there is engineering that's
16         performed in this process, and that's the thing
17         that I'm here to look at, not to memorize an inch
18         worth of codes, but to look at engineering
19         aspects as they apply to that.  If you want to
20         ask me questions about that, specific questions,
21         go ahead.
22    BY MR. SIMPSON:
23         Q    Well, I intend to.
0041
 1         A    Please do.
 2         Q    What, if any, HUD code violations do you
 3    find in this particular home?
 4         A    We're talking about the Murphy home?
 5         Q    Yes, sir.
 6         A    Well, you've got vinyl on the inside surface
 7    of the wall, and you've got air -- that's one, that's
 8    the type of wall that they selected, according to the
 9    504 in the code.  Okay.  Now, in this particular
10    instance you've got hot, moist, humid air that is
11    penetrating through the walls.  It gets to the back of
12    the interior wall.  It cannot penetrate through
13    because of the vinyl covering, and therefore it
14    condenses, because that inside is cooler than the
15    outside air.  It condenses, and you get water
16    accumulating.
17         Q    Can you tell me specifically what HUD code
18    provisions the Murphy home is out of compliance with.
19    Just give me a list.
20         A    Out of compliance with?  Well --
21         Q    Yeah.
22         A    -- somebody has made a decision as to the
23    type of wall to build, and it's going out into the
0042
 1    field and it's not performing.
 2         Q    Which HUD code provision do you think is
 3    violated in that sense?
 4         A    Well, I think it's -- the manufacturer has
 5    made a choice under the 504, and I think the failure
 6    is under the 303.
 7         Q    So you think that 3280.303 is violated?
 8         A    It doesn't perform.
 9         Q    Is that your judgment?
10         A    It doesn't perform.  If you've got water
11    condensing on the inside of the wall, it's not
12    performing.
13         Q    Sir, let's see if you can stick to my
```

                              Page 16

kondnerdr.txt
14    question.  My question is:  Just give me a list of the
15    HUD code provisions which you think are violated in
16    this particular home.
17         A    Well, let me pull out the HUD code here and
18    take a look.
19         Q    You don't know without looking?
20         A    Yeah, I know.  I just told you.  Now you
21    want details on it.
22         Q    Just give me a list.  Just start with a
23    list, one, two, three, four, however many you got.
0043
1     what HUD code, what provision is violated here?
2          A    Well, under 504 you've got a choice.  You've
3     got a choice under 504.
4          Q    What version of the HUD code are you looking
5     at?
6          A    I'm looking for a date.  Don't see a date.
7     Okay, here we go.  It says -- it's maybe '93.  I don't
8     know.  I don't see a date on the outside of it.
9          Q    Do you know what year this home was
10    manufactured?
11         A    Offhand I don't recall.  I'd have to look at
12    it.
13         MR. PELS:  Scott, do you want him to still
14    answer about the sections of the HUD code?
15         MR. SIMPSON:  Yeah, I'll get back to that.
16    I want to try to figure out what he's looking at.
17         MR. PELS:  I don't think he's got the B4.
18    That's a pre-HUD code thing.  I think we gave it
19    to him a couple years ago.  I'll see if I can see
20    a date on it, but . . .
21         MR. SIMPSON:  That's okay.  Don't worry
22    about it.  Let's just keep going.
23
0044
1     BY MR. SIMPSON:
2          Q    Do you know what year this home was
3     manufactured?
4          MR. PELS:  He's looking at it.
5          THE WITNESS:  I'm looking to see what the
6     plate had on it.  It would be in Bonney's report,
7     because Bonney has seen it and I haven't.
8     BY MR. SIMPSON:
9          Q    Where is the data plate in a home; do you
10    know?
11         A    It's -- let's see.  I'm just trying to think
12    where it's located.  It has to be in there.  It has to
13    be located in there, and I don't recall where it is.
14    Date of manufacture.  Here it is.  January 9, '03.
15         Q    What's a data plate look like?
16         A    Well, I've seen them.  It's so big and it's
17    got the information on it, the number of the unit and
18    so forth, and the date of the manufacture, the
19    manufacturer.
20         Q    Dr. Kondner, what design choices did
21    Southern Energy have available the year this home was
22    manufactured relative to wall design?
23         A    Well, you certainly had -- you certainly had
0045
1     the material here in 504, and it could have been
2     ventilated.  You could have had an exception.  You
3     could have --
4          Q    Let's start with ventilated.  What HUD code
                          Page 17

kondnerdr.txt

```
 5  section is that?
 6       A    That's 504(b)(2), unventilated.
 7       Q    All right.  So which one is ventilated and
 8  which one is unventilated?
 9       A    Uh, (b)(3).
10       Q    Is ventilated?
11       A    Yeah.
12       Q    Okay.  Can you tell me for the record what a
13  (b)(3) wall looks like.
14       A    Well, you would have to have some kind of an
15  air flow within that wall structure.  It says right
16  here, "Wall cavities shall be constructed so that
17  ventilation is provided to dissipate any condensation
18  occurring in the cavities."
19       Q    So what's it look like?  Have you ever laid
20  eyes on one?
21       A    I don't know that I have or haven't.
22       Q    Have you ever seen a (b)(2) wall?
23       A    (b)(2) wall, unventilated wall cavity.
0046
 1  Well, I don't know that I've ever torn any of them
 2  apart.  I don't know that I've ever seen any of them
 3  cut open if that's what you're asking.
 4       Q    Have you ever seen a (b)(2) wall anywhere in
 5  the world?
 6       A    Unventilated wall cavity --
 7       Q    This shouldn't be hard.  You're supposed to
 8  be the expert on this.  Have you ever seen a mobile
 9  home with a (b)(2) wall?
10            MR. PELS:  Objection; move to strike the
11       soliloquy.
12            THE WITNESS:  I don't know that I have or
13       haven't, quite frankly.
14  BY MR. SIMPSON:
15       Q    Have you ever seen a (b)(1) wall?
16       A    Yes.
17       Q    Where?
18       A    In units here in Maryland.
19       Q    Tell me what the Murphy wall is constructed
20  with.  Go from the inside to the outside of the wall
21  and give me each layer.
22            You're not going to find that on any of the
23  papers you're shuffling around.
0047
 1       A    Well, it should be in Bonney's report, I
 2  would think.
 3       Q    I want to know what you know, not what
 4  Mr. Bonney knows.
 5       A    I haven't seen it.  I haven't been down
 6  there.  I haven't looked at it.
 7       Q    But you're an engineer.  You're an expert.
 8  what's the wall made of?  Tell me what's in it.
 9       A    What's in it?  I believe this is the one
10  with the vinyl siding on it.
11       Q    And what's underneath the vinyl?
12       A    And then you've got some wallboard.
13       Q    What kind?
14       A    Probably that blackboard.  That's why I'm
15  looking in here.  I don't know.
16       Q    Do you know if it has OSB?
17       A    It may.
18       Q    What's OSB?
19       A    It's a -- wait a minute.  Hold it.
```

Page 18

kondnerdr.txt

```
20        Q    Sir, what is OSB?
21        A    That's a board, a wallboard.
22        Q    What's it stand for, the initials?
23        A    OSB?  Outside board?  I don't know.
0048
 1        Q    Do you know what kind of sheeting this home
 2   has, or are you just guessing?
 3        A    That's what I'm looking for.  I haven't been
 4   down here.  I haven't seen it.
 5        Q    So you don't know sitting here without
 6   looking up what someone else says what's it made of,
 7   right?
 8        A    That's right, and that's what I relied upon.
 9        Q    Okay, but you don't even know what you
10   relied upon, because you can't tell me?
11        A    I can't find it in here right now.
12        Q    What's underneath the OSB?
13        A    You got insulation in there.
14        Q    How thick is the insulation?
15        A    This particular?  I don't think he's got it
16   in here.
17        Q    I want to know what you know.
18        A    I don't know anything about the house,
19   physical house itself, because I was never there.  I
20   have never seen it.  I have to rely on Bonney's
21   report.
22        Q    You're saying these walls are going to fail,
23   and you can't even tell me what they're made of.
0049
 1        A    No, but I can tell you this.  They got
 2   moisture contents in there from 25 to 40 percent, and
 3   you've got mold forming and you've got an accumulation
 4   of it, and the longer it goes on, the more water
 5   you're going to get in there, and eventually that
 6   gypsum board is going to fall apart, eventually.
 7        Q    Sir, the truth is you have never physically
 8   seen with your own eyes any (b)(1) wall that has
 9   failed, ever.
10             MR. PELS:  Objection; form and foundation.
11   BY MR. SIMPSON:
12        Q    And if you have, tell me where and when.
13        A    Well, it certainly isn't the one we're
14   talking about.  I don't know that I -- well, wait a
15   minute.  I'll take that back.  I have seen some that
16   have failed, and I've seen them with a mold over them,
17   and I've seen them with the plaster board falling off,
18   and I can tell you where.  They're down by Annapolis.
19        Q    Sir, tell me one manufactured home in --
20        A    And I don't know who manufactured it --
21        Q    Answer my question.
22        A    -- but I did a preconstruction survey on it.
23        Q    Answer this question.  Can you tell me of
0050
 1   one manufactured home sited in the humid or fringe
 2   zone climate that you've seen in your life that is
 3   failing from condensation.
 4        A    Do you want the manufacturer?
 5        Q    Just one manufactured home in your whole
 6   life that --
 7        A    Well, I know a particular building, a
 8   manufactured home, and I saw the mold on it, I saw the
 9   wallboard falling apart, and somewhere I've got
10   photographs of it.
```

Page 19

kondnerdr.txt
```
11        Q    Let's stick with my question.
12        A    And I don't know who manufactured it,
13   because I wasn't looking for this particular type of
14   case.  I was doing a preconstruction survey.
15        Q    Let's stick with my question, Dr. Kondner.
16   Can you tell me about one manufactured home in your
17   life that you have physically seen in the humid and
18   fringe zone climate with a (b)(1) wall design that is
19   failing that you have seen with your own eyes.  Just
20   one.
21        A    Now you've restricted it a little further.
22   You were talking about this coastal hot humid climate,
23   and I haven't been down in that area looking at these
0051
1    units.
2         Q    So you haven't seen even one of these fail
3    in the field in the humid and fringe zone climate;
4    that's your testimony?
5              MR. PELS:  Objection.
6              THE WITNESS:  Well, I've seen one of them
7         fail up here in Maryland.
8    BY MR. SIMPSON:
9         Q    But we're not in a lawsuit in Maryland.
10        A    No, you're not, but you asked the question
11   and I answered it.
12        Q    Well, I just want to confirm.  You've never
13   seen one in the field in Alabama or anywhere else in
14   the humid and fringe zone that has failed, correct?
15        A    I tend to take that back, because I recall
16   in Mobile, Alabama, at a Ramada Inn where they had
17   trouble with the wallboards falling apart.
18        Q    Mobile homes, sir.
19        A    Well, okay.  Similar type of construction.
20        Q    Have you seen a mobile home fail with your
21   own eyes in the humid and fringe zone climate in your
22   life?
23             MR. PELS:  Objection.
0052
1              THE WITNESS:  Not necessarily a mobile home.
2         I may or I may not have, but I've seen them fail
3         and I've seen them in that climate.
4    BY MR. SIMPSON:
5         Q    I want to know one you've seen fail in
6    Alabama in the humid and fringe zone climate in your
7    life, a mobile home.  I don't want to hear about
8    hotels.  I don't want to hear about Maryland.  I want
9    to hear about a manufactured home that you have
10   physically seen and has failed.
11             MR. PELS:  Objection; asked and answered.
12             THE WITNESS:  I don't believe I have.  I may
13        have, but I don't believe I have.
14   BY MR. SIMPSON:
15        Q    Thank you.  Now, is it your opinion that
16   internal moisture retarders or moisture barriers are
17   the problem in this case?
18             MR. PELS:  Objection.  You can answer.
19             THE WITNESS:  Yes.
20   BY MR. SIMPSON:
21        Q    Does it matter what kind of internal vapor
22   barrier is used?
23        A    Certainly.
0053
1         Q    I mean is there one better than another?
```

kondnerdr.txt

2          A    Well, you've got to look at what you're
3    trying to accomplish, and in that particular climate
4    down there you certainly don't want to put it on the
5    inside surface of a cool wall where you've got hot
6    humid air traveling through the outside structure and
7    condensing on the back side of that.  You don't want
8    that.  That's poor engineering judgment.  Try a
9    different design.  I mean they allow you different
10   designs.
11         Q    Doctor, please, let's not get into speeches.
12   Just please -- I'm going to ask questions, you give me
13   answers; okay?  Or we're going to be here all day.
14            MR. PELS:  Objection, Scott.  He was
15         answering your question.  Part of the problem,
16         Scott, is you ask questions and you won't let him
17         answer.  He's still not gotten a chance to answer
18         the question about the HUD code sections.
19            MR. SIMPSON:  We're going to come back to
20         that.
21            MR. PELS:  But you tend to cut him off
22         before he answers.
23            MR. SIMPSON:  Well, I disagree with that.
0054
1    BY MR. SIMPSON:
2          Q    What other method of design using an
3    internal vapor barrier can a manufacturer use other
4    than vinyl?
5          A    Well, you could use the Kraft paper type or
6    you could have it discontinuous.  You got to have some
7    air going through there.  You got to be able to
8    dissipate that water vapor.  And if you've got that
9    inside sealed off and it's a cool surface and you've
10   got hot humid air coming in, it's going to condense on
11   it.  It's as simple as that.  I mean this isn't rocket
12   science.
13         Q    Are you aware of any studies authoritative
14   in the field which stand for the proposition that
15   internally-facing Kraft backpaper in a manufactured
16   home is a superior design choice over vinyl-coated
17   gypsum?
18         A    Over vinyl-covered gypsum?  It depends on
19   whether it's continuous or not.  It depends on how you
20   use it.
21         Q    I'm not asking for your opinion, Doctor.
22   I'm wondering if you have any authoritative studies,
23   authoritative works, authoritative treatises which
0055
1    state that vinyl-coated gypsum is not as effective in
2    manufactured homes for controlling condensation as
3    Kraft backpaper turned to the inside of the wall?
4          A    Oh, I think you would find some of it in
5    that, the literature that you already have.
6          Q    Well, I'm not interested in going fishing.
7    I want to know if you know sitting here today.  Can
8    you cite me to any.
9          A    Well, there's some in there, but I can't
10   cite it to you.
11         Q    Let's go back to my HUD code question.  Give
12   me a list of the HUD code provisions that you think
13   are violated in this particular home, the Murphy home.
14         A    Well, somebody has made a design choice, a
15   design --
16         Q    Just give me a list if you would.  We can