982parks.rough depo.txt

```
12        has prescribed a need for additional
13        evidence to be retrieved from the home.
14        After the defense inspection has been
15        completed, large samples of gypsum
16        board from various locations will be
17        removed for sampling of fungal growth.
18   Q.   But you say this in every report.
19   A.   Right.  If the air samples come back,
20        then yes, I believe that we should go
21        back and take bulk samples from that
22        material to identify that the mold
23        growth is occurring within that gypsum
```

***UNCERTIFIED ROUGH DRAFT COPY***

59

***UNCERTIFIED ROUGH DRAFT COPY***

```
 1        board and where it's --
 2   Q.   But you first started doing invasive
 3        testing only after the Byrd and
 4        Daugherty cases, when we did invasive
 5        testing.  You've never actually done
 6        this prior to that case; correct?
 7   A.   For the Beasley firm?
 8   Q.   Yeah.
 9   A.   Again, as I stated here, that --
10   Q.   Have you or haven't you?
11   A.   No, because I wasn't alerted as to when
12        you're testing or when the defendants'
13        testing was done.  That's why some of
14        it was done rather -- some of the homes
15        that I've done were done very quickly
16        because I had just found out that the
```

982parks.rough depo.txt

17    defense was finished.  So that was my

18    intent from the beginning as to --

19  Q.  To render a report, then let us study

20    it, and then go back and create new

21    evidence after the fact?  That was your

22    intent?

23  A.  No.  My intent was that I didn't want

***UNCERTIFIED ROUGH DRAFT COPY***

☐

60

***UNCERTIFIED ROUGH DRAFT COPY***

1    to go out there and start cutting open

2    walls and give you an excuse to --

3  Q.  To do the same thing and have an equal

4    testing opportunity?

5  A.  Can I finish my answer?

6  Q.  Sure.

7  A.  Because I didn't want to go out there

8    and do destructive testing like this

9    and then have you say that you couldn't

10    run other types of tests because I've

11    caused some kind of degradation to the

12    envelope of the home or to the walls of

13    the home by cutting holes in it.  So I

14    wanted to give my -- my thought pattern

15    and my advice was to give you

16    opportunity, or the defense in whatever

17    case, the opportunity to inspect the

18    home in the same manner that I did and

19    then afterwards go back or -- it could

20    have been done at the same time, but I

21    wasn't aware of when your inspections

982parks.rough depo.txt

22    were done.

23  Q.  Mr. Parks, true or not true?  Prior to

***UNCERTIFIED ROUGH DRAFT COPY***

61

***UNCERTIFIED ROUGH DRAFT COPY***

1     the Byrd and Daugherty homes where you

2     first was introduced to our form of

3     invasive testing, you never did

4     anything like that in any of the --

5  A.  That's false.  I've done that in many

6     homes in the past where --

7  Q.  In any of the Beasley cases.

8  A.  I don't recall if that was the first

9     one or not.  But your -- your cutting

10     into the wall had absolutely nothing to

11     do with why I did that.

12  Q.  Well, why did you wait until after we

13     went to the expense of flying three

14     experts in to look at this house to

15     render new opinions?  That's what I'm

16     trying to get at.

17  A.  My -- my rendering of opinions and when

18     I did my report has absolutely nothing

19     to do with you or your experts or what

20     you decide to do.  I have -- I have no

21     opinion, knowledge -- you're not a

22     concern for me.  My issue, my concern,

23     is to substantiate my beliefs and my

***UNCERTIFIED ROUGH DRAFT COPY***

62

982parks.rough depo.txt
***UNCERTIFIED ROUGH DRAFT COPY***

1    opinions in this case.

2         Now, my reason for not doing

3    this on the initial visit, as I just

4    stated, is I didn't want to alter the

5    structure on the house that would cause

6    you an inability to do some kind of

7    other testing that you wanted to do.

8    That's why I recommended that we do as

9    minimally invasive testing as

10   absolutely possible until after you

11   have your opportunity or the defense in

12   any case has their opportunity to do

13   their full realm of testing.  When

14   they're finished, then we could go back

15   and do more invasive work.  That was my

16   recommendation from day one, and it has

17   nothing to do with you or you flying in

18   three experts or anything else.

19 Q.  Well, why didn't you invite us out

20   there to be present when you were doing

21   yours?

22 A.  That wasn't my job or my decision.

23   My -- my request was to have an


      ***UNCERTIFIED ROUGH DRAFT COPY***

                                        63
      ***UNCERTIFIED ROUGH DRAFT COPY***

1    opportunity to go back when y'all were

2    finished -- or it could have been at

3    the same time; I really don't care --

4    but the opportunity to take these bulk

                 Page 49

982parks.rough depo.txt

```
 5       samples after you've done any other

 6       testing that you wish to do that that

 7       invasive testing might interfere with.

 8   Q.  Well, you understand, though, that when

 9       we go out there, we want to have your

10       report with us; right?

11   A.  What you want is completely irrelevant

12       to me.  I'm not an attorney.  I don't

13       know the protocol.  And frankly, I

14       don't care.  My -- my job is to render

15       an opinion as to whether these homes

16       are -- the walls have elevated moisture

17       and then to offer opinions and evidence

18       to substantiate that.

19   Q.  How many other Beasley houses have you

20       actually done this kind of invasive

21       testing on?  Give me the names of the

22       cases and the dates of the testing.

23   A.  I can't give you all of those.  I don't
```

***UNCERTIFIED ROUGH DRAFT COPY***


64

***UNCERTIFIED ROUGH DRAFT COPY***

```
 1       know them right off the top of my head.

 2       But I know that I've done it in --

 3   Q.  A Fleetwood case.

 4   A.  Now, you mentioned the Byrd and

 5       Daugherty case.  I didn't do this kind

 6       of testing in that.

 7   Q.  That's my point.  I don't see any

 8       evidence in any Beasley case from any

 9       defendant where you've done this kind
```

Page 50

982parks.rough depo.txt

```
10       of prior than October of 2007.
11   A.  Wow.  So you're reviewing every case
12       for every defendant, not just Southern
13       Energy?
14   Q.  You've got a lot of reports out there.
15   A.  Well, I'm glad y'all are working
16       together like that.  Herron, Moore;
17       those are Palm Harbors.
18   Q.  When did you do those?
19   A.  I don't remember the specific dates.
20   Q.  I mean, the last thirty --
21                MR. GOULD:  It would have
22                     been a little bit after
23                     Murphy.
```

***UNCERTIFIED ROUGH DRAFT COPY***

65

***UNCERTIFIED ROUGH DRAFT COPY***

```
 1                THE WITNESS:  It was a
 2                     little bit after Murphy?
 3                MR. GOULD:  I mean, not
 4                     after Murphy.  I think
 5                     it was after the
 6                     Southern Energy --
 7                THE WITNESS:  Yeah, it was
 8                     after the Southern
 9                     Energy.
10                MR. GOULD:  -- arbitration
11                     hearing.
12   Q.  (BY MR. SIMPSON) Here's what I'm trying
13       to get at:  You've never done this kind
14       of invasive testing in a Beasley case
```

Page 51

982parks.rough depo.txt

15    prior to, say, September '07?

16 A.  I don't recall. But I don't think I

17    have because I wasn't alerted that the

18    defense -- that -- that the opportunity

19    was there, that it was time for me to

20    go back and do it. I can say

21    definitively it had absolutely nothing

22    to do with you or the Daugherty case.

23 Q.  Well, here's my point: In Byrd and

***UNCERTIFIED ROUGH DRAFT COPY***

66

***UNCERTIFIED ROUGH DRAFT COPY***

1     Daugherty, you rendered a report

2     indicating that there was some level of

3     mold in the ambient air in the wall

4     cavity; correct?

5 A.  That's correct. And in that case, I

6     was also able to peel off a large piece

7     of the wallboard on the inside that

8     gave very --

9 Q.  In one home.

10 A.  -- visible -- right. Well, we're

11    talking about that.

12 Q.  But here's my point. You've never gone

13    back in any other case we've handled or

14    any other manufacturing case that I'm

15    aware of prior to this past month where

16    you've actually gone back and done more

17    testing after the defense was given its

18    opportunity.

19 A.  If -- and that would only be because

Page 52

982parks.rough depo.txt

```
20      I've not been given a list of homes
21      that those reports have been rendered
22      on and that -- that -- that I'm offered
23      that opportunity to.  But --
```

***UNCERTIFIED ROUGH DRAFT COPY***

67

***UNCERTIFIED ROUGH DRAFT COPY***

```
 1  Q.  But you would agree with me that prior
 2      to, say, last month, this just isn't
 3      something that you've ever done for
 4      Beasley.
 5  A.  And you're saying for Beasley.  And no,
 6      because I wasn't notified that the
 7      defense --
 8  Q.  I don't care the reason.  I just want
 9      to know --
10  A.  No.
11  Q.  -- yes or no.
12  A.  You just want me to say no so you can
13      copy it and paste it out of a
14      deposition and make it look like
15      something it's not.  And the bottom
16      line --
17  Q.  I just want to know yes or -- you don't
18      have to argue with me.  I just want to
19      know yes or no prior to last month,
20      you've never done this kind of testing
21      in any other case for the Beasley firm.
22  A.  No, because I have not been notified
23      that the defense was finished with
```

***UNCERTIFIED ROUGH DRAFT COPY***
Page 53

982parks.rough depo.txt

68

***UNCERTIFIED ROUGH DRAFT COPY***

1       their investigation.

2  Q.   So the answer is no.

3  A.   Because -- because I've not been

4       notified that it was the time.

5  Q.   Now, if you were defending a case like

6       this, hypothetically speaking, what

7       would you think would be a reasonable

8       reinspection -- what protocols would

9       you undertake to verify someone like

10      your data was accurate or inaccurate?

11 A.   I don't think I would take -- I don't

12      see a defense for this.

13 Q.   Well, let me ask you this.  If you

14      wanted to make sure that your samples

15      were accurate, would it be fair for us

16      to go in an adjoining piece and pull a

17      sample off as well?

18 A.   Same wall --

19           MR. GOULD:  When you say

20              adjoining piece --

21 Q.   I mean, does it have to connect to your

22      square?  How close does it have to be?

23 A.   I think if you stay in a wall cavity,

***UNCERTIFIED ROUGH DRAFT COPY***

69

***UNCERTIFIED ROUGH DRAFT COPY***

1       you -- to get an accurate reading, not

2       to try to lend it to, you know, to

3       discrepancies, you would want to stay

Page 54

982parks.rough depo.txt

```
 4        in the same wall cavity and stay in a
 5        general vicinity of the same -- same
 6        area.
 7   Q.   When you cut these pieces off, you
 8        chose the areas that you thought were
 9        the highest concentration of mold.
10   A.   Absolutely not.  These -- these --
11        these areas were completely random.
12   Q.   Completely random?
13   A.   Completely random.  As a matter of
14        fact, two of the areas that I cut wound
15        up being in closet areas and came back
16        with no mold detected at all because
17        those closet areas don't have air-
18        conditioning vents in them and stay
19        considerably warmer.
20   Q.   Well, tell me, where is your protocol
21        for the random removal of samples?  Do
22        you have one?
23   A.   I did not establish a protocol for
```

***UNCERTIFIED ROUGH DRAFT COPY***

70

***UNCERTIFIED ROUGH DRAFT COPY***

```
 1        taking -- I don't have a written
 2        protocol for this.  It is simply -- I
 3        never even went inside of the home
 4        during the third visit when I took the
 5        bulk samples.  I simply stayed in areas
 6        that were well away from corners,
 7        windows, doors, anything that -- TV
 8        antennas, anything else that you might
```
Page 55

982parks.rough depo.txt

```
 9      want to try to blame it on, open areas;
10      moved a piece of siding that was
11      available and completely random cutting
12      out those samples.
13   Q.  Why did you take two samples in
14      Bedroom 3?
15   A.  Oh, on that corner?
16   Q.  Yeah.
17   A.  As I -- when I cut the first one out,
18      after I'd already marked it and located
19      it, I noticed down below it there was
20      an area where apparently you had opened
21      it up and looked at it but chose not
22      the take a sample, that I'm aware of,
23      anyway.  I've not seen any reports from
```

***UNCERTIFIED ROUGH DRAFT COPY***

71

***UNCERTIFIED ROUGH DRAFT COPY***

```
 1      your side.  So --
 2   Q.  You didn't see any samples.  We didn't
 3      peel any paper that you could see.
 4   A.  No.  No.  I never saw any -- any bulk
 5      samples taken.
 6   Q.  I'll represent to you we didn't do that
 7      because we didn't see that you had done
 8      that.
 9   A.  Oh, so you only want a sample if I do
10      it, huh?
11   Q.  Well, I mean, our protocol is to
12      analyze your report.  And you didn't do
13      that, any kind of sampling, so we
```
Page 56

982parks.rough depo.txt

14       didn't do it either. So I'm just
15       wondering why you did two in Bedroom 3.
16   A.  Well, I was getting to that before you
17       interrupted me.
18   Q.  Please continue, Mr. Parks. I don't
19       want to interrupt you.
20   A.  I would appreciate that. As I cut
21       Sample 5, I noticed down below me there
22       was some tape sticking up. So I looked
23       down there and there was an area that

***UNCERTIFIED ROUGH DRAFT COPY***

72

***UNCERTIFIED ROUGH DRAFT COPY***

1        you had opened up or your experts, or
2        whoever, and I noticed there didn't
3        appear to be any bulk samples there.
4        And not -- not knowing, I thought that
5        would be an excellent place to open up
6        and test.
7    Q.  So which number, five or six, in your
8        judgment, is the area you think we
9        looked at?
10   A.  Six. I believe it was area -- well,
11       wait a minute. Let me look at that
12       because I may be -- can I see that
13       report, please?
14   Q.  Sure.
15   A.  Or is that my -- yeah, that's my color
16       copy. Yes. Area 6 is the one that I
17       found that was opened up and taped back
18       closed.
                         Page 57

982parks.rough depo.txt

19   Q.   Why did you take two samples in

20        Bedroom 2?

21   A.   I'm sorry?

22   Q.   Bedroom 2 has two samples, three and

23        four.


        ***UNCERTIFIED ROUGH DRAFT COPY***


                                              73
        ***UNCERTIFIED ROUGH DRAFT COPY***

 1   A.   I took one -- the -- on the back side

 2        of the house, there is an awning across

 3        the back.  Because I felt like I wanted

 4        to take one from under the awning and

 5        one that was not under the awning to

 6        eliminate a consistency of the awning

 7        causing a water leak scenario.  As I

 8        said, I never walked inside of the

 9        house.  That's why I wasn't aware that

10        there was an actual closet there where

11        I took the second one from Wall

12        Cavity 2, but I was simply taking one

13        from that end of the house.

14   Q.   Why did you take one in Bathroom 2?

15   A.   Again, I did not know that that was the

16        bathroom that I was taking one behind.

17        I stayed between -- if you look at the

18        pictures from the front of the house, I

19        stayed as close to the center of the

20        windows as I could find to stay away

21        from the windows.

22   Q.   Why do you stay away from windows?

23   A.   Well, because that would be an excuse

                    Page 58

982parks.rough depo.txt

***UNCERTIFIED ROUGH DRAFT COPY***

74

***UNCERTIFIED ROUGH DRAFT COPY***

1    that you would have to say, Oh, it's a

2    water leak and not a condensation

3    problem.

4  Q.  And why did you take Sample 8, which is

5    the kitchen?

6  A.  Again, I decided to take eight samples

7    from around the house.  And, again, I

8    stayed between the windows, away from

9    anything that I felt like that you

10    would possibly blame it on as a water

11    leak.

12  Q.  Master bath, you took two samples why?

13  A.  Again, those were random areas.  Now,

14    on the left side, the -- on the -- I

15    think that's the master bedroom side,

16    if I could see that again.  There are

17    multiple windows right there on the

18    corner of the house, and I didn't want

19    to sample it there because that would

20    have been another area that I felt like

21    you would write off as a water leak

22    area.  So, again, I stayed away from

23    the windows.

***UNCERTIFIED ROUGH DRAFT COPY***

75

***UNCERTIFIED ROUGH DRAFT COPY***

1  Q.  Well, half of the samples -- wouldn't

982parks.rough depo.txt

```
 2      you agree? -- are in rooms where

 3      there's water, two bathrooms and a

 4      kitchen?

 5  A.  No.  I would -- well, actually, the one

 6      in the kitchen came back clean.  There

 7      was no problem with that one.

 8  Q.  But there's water in all three of those

 9      rooms.  Half your samples are in rooms

10      where there's --

11  A.  No, not half the samples.

12  Q.  Well, there's eight.

13  A.  Yes.

14  Q.  And I'm counting one, two, three, four.

15  A.  Okay.  Well, I would agree yes, there's

16      water in the room.  But we have a vapor

17      barrier of less than one perm on that

18      living side, so the water in the room

19      doesn't affect the wall cavity.

20  Q.  All right.  So you would agree with me

21      that whatever mold contamination you

22      claim to exist in the wall cavity has

23      nothing to do with the presence or
```

***UNCERTIFIED ROUGH DRAFT COPY***

0

76

***UNCERTIFIED ROUGH DRAFT COPY***

```
 1      absence of mold in the indoor air?

 2  A.  Oh, can you say that again, please?

 3  Q.  Yeah.  Would you agree with me -- you

 4      just said that the water can't go

 5      through there, and I'm just --

 6  A.  Correct.
```

Page 60

982parks.rough depo.txt

7  Q.   -- trying to also establish that the

8       mold can't get through there, either.

9  A.   To the living side of the house?

10 Q.   Yes.

11 A.   I think it's very much restricted

12      unless you have some kind of negative

13      pressure that's causing an air flow

14      inward through electrical outlets and

15      stuff like that.  But as I also stated,

16      I've not tested any air samples from

17      inside the house.  That was never part

18      of my instructions.

19 Q.   Would it be reasonable for a person who

20      sat through your second inspection to

21      load up the family and move out?

22 A.   I can't -- I can't tell you what

23      their -- their thought patterns were.

***UNCERTIFIED ROUGH DRAFT COPY***

77

***UNCERTIFIED ROUGH DRAFT COPY***

1  Q.   I didn't ask you that.  I just wondered

2       in your professional scientific

3       judgment, was there any evidence

4       available during the second visit that

5       you think was -- formed a reasonable

6       basis for someone moving out?

7  A.   I can only tell you that I would not

8       recommend -- I would not have and have

9       not ever told a client that I would

10      move out of this house because of what

11      I saw within the wall cavities.  That I

Page 61

982parks.rough depo.txt

```
12      can recall, I've never said that to

13      anyone.

14  Q.  So if Ms. Murphy had asked you that the

15      day you were out there and showed her

16      these pictures, you would have told

17      her, hypothetically speaking, not to

18      move out because you have no evidence

19      that the indoor air quality is poor?

20  A.  I would not have stated it that way.

21      What I would have told her is that I'm

22      not testing indoor air quality but

23      based on my experience, the same issue
```

***UNCERTIFIED ROUGH DRAFT COPY***

78

***UNCERTIFIED ROUGH DRAFT COPY***

```
1       that's causing the moisture to

2       accumulate the wall is also, in a

3       sense, protecting the inside

4       environment, because just as the

5       moisture cannot diffuse through, you've

6       built a barrier there that really

7       limits what's going on in the wall

8       cavity to the exposing of the inside

9       air.  So I would have tried, if

10      anything -- and that's -- I'm not

11      saying I told that to her.  I'm just

12      saying in general when I speak to

13      someone about this issue, that's what

14      I -- that's what my explanation is.  If

15      anything, I try not to alarm people.

16  Q.  So fair to say on your second visit
```

Page 62

982parks.rough_depo.txt

17    there was no reason for alarm for

18    purposes of indoor air quality?

19 A.  I didn't test indoor air quality, so I

20    really can't render an opinion as to

21    that.

22 Q.  Well, what I'm saying is, you had no

23    evidence that there was any cause for

***UNCERTIFIED ROUGH DRAFT COPY***

79

***UNCERTIFIED ROUGH DRAFT COPY***

1    alarm for indoor air quality on your

2    first, second, or third visit.

3 A.  You said I had no evidence.  That's

4    correct, because I did not test for it.

5 Q.  In terms of setup, are there any setup

6    issues with this house that are causing

7    water or potential mold communication

8    into the walls?

9 A.  I believe Mr. Bonney is going to speak

10    to setup-related issues.  But as they

11    pertain to moisture problems, I really

12    didn't see anything that was out of the

13    ordinary that's going to contribute to

14    the problem that I see in the walls.

15    Now, could it contribute to other

16    problems such as underneath the house,

17    possible floor problems, stuff like

18    that, yes, but not to the wall problem,

19    no, sir.

20 Q.  But you testified a little while ago

21    you've never even read his report, so

Page 63

982parks.rough depo.txt

22     you don't know sitting here right now

23     whether any setup issues contributed or

***UNCERTIFIED ROUGH DRAFT COPY***

80

***UNCERTIFIED ROUGH DRAFT COPY***

1      didn't contribute to wall or -- water

2      in the wall or mold in the wall?

3   A. You're -- I can give you my opinion

4      that no, they did not.  And I've not

5      read Mr. Bonney's report, nor do I need

6      to.  Mr. Bonney's report, as I

7      understand it, typically do not address

8      what does or does not cause moisture

9      problems other than maybe something

10     that he's familiar with.  My opinions

11     are on the wall cavities.  The setup

12     issues or lack of in this house or how

13     it's set up is a little unusual, but I

14     do not believe that they are

15     contributing to why this problem is

16     occurring in the wall.  The reason the

17     problems are occurring in the wall is

18     because we have a continuous vapor

19     barrier on the wrong side.

20   Q. Did you go on the roof?

21   A. Did I go on the roof?  No, sir, I did

22     not.

23   Q. Did you go under the house?

***UNCERTIFIED ROUGH DRAFT COPY***

81

***UNCERTIFIED ROUGH DRAFT COPY***
Page 64

982parks.rough depo.txt

1  A.  I didn't crawl.  I looked under, but I
2      didn't crawl under, to the extent that
3      Mr. Bonney did, anyway.
4  Q.  And you would agree that this is an
5      unorthodox setup?
6  A.  I wouldn't say "unorthodox."  No, I
7      wouldn't use that word.  I'd say it's
8      unusual.
9  Q.  What's unusual about it?
10 A.  Well, typically, you don't have the
11     formation, the levels not brought up
12     around the front.  However, the back is
13     left open.
14 Q.  This has dirt all the way up to the
15     edges of the building and cross-ties
16     all the way around on three sides.
17 A.  Correct.  Correct.
18 Q.  And that's -- well, I've been doing
19     this a long time.  I've never seen
20     that.  Have you ever seen another home
21     like that?
22 A.  I've seen many homes set up similar to
23     that.

        ***UNCERTIFIED ROUGH DRAFT COPY***

                                        82
        ***UNCERTIFIED ROUGH DRAFT COPY***
1  Q.  With dirt all the way up to the edge of
2      the walls?
3  A.  I've seen them brought up to -- I think
4      there are a couple cinder blocks or
5      maybe one cinder block.  It's not
                Page 65

982parks.rough depo.txt

```
 6      brought all the way up to the wall
 7      structure itself.  There's a block
 8      under it.  But it is brought up very
 9      high around the perimeter and then
10      there's cross-ties sitting around that.
11      But yes, I mean, I've seen them where
12      they -- I've seen all kind of setups
13      where they actually dig basements
14      underneath them into the ground to --
15   Q. Do you know whether this setup violates
16      the installation?
17   A. I have not reviewed the installation
18      manual, and that's not part of my job
19      description.
20   Q. Fair to say it's not your job to rule
21      out setup-related issues to moisture?
22   A. Yes, sir, it is.  My job is, well, to
23      is field and render opinions on what is
```

***UNCERTIFIED ROUGH DRAFT COPY***

☐

83

***UNCERTIFIED ROUGH DRAFT COPY***

```
 1      affecting the wall structure of this
 2      home and the moisture-related issues in
 3      the wall structure.
 4   Q. But you didn't crawl under the house?
 5   A. Yes, I did, but not to the extent that
 6      Mr. Bonney did.
 7   Q. Well, what extent did you do it?
 8   A. I went in to the edge to look for
 9      bottom boards being torn and, you know,
10      degradation, you know, big stuff like
```

Page 66

982parks.rough depo.txt

```
11      that that would continue contribute to
12      really more floor problems than -- but
13      I didn't have any floor problems in
14      this house that I noted.
15  Q.  Did you remove the trellis that --
16  A.  No.
17  Q.  -- keeps you from going underneath the
18      home?
19  A.  Under the -- I went under the porch.
20  Q.  The back porch or front porch?
21  A.  The back porch.  The front porch is a
22      concrete slab.
23  Q.  Was there a trellis material blocking
```

***UNCERTIFIED ROUGH DRAFT COPY***

84

***UNCERTIFIED ROUGH DRAFT COPY***

```
1       your way?
2   A.  I don't recall specifically.  That's
3       been over a year ago, year and a half
4       ago.
5   Q.  Did you take any pictures?
6   A.  Not from underneath the home, I don't
7       believe, no, sir.
8   Q.  Did you look for a torn belly?
9   A.  Yes, but I didn't note anything
10      significant at that time.
11  Q.  So you don't know sitting here today if
12      there's any tears in the belly?
13  A.  And even if there was tears in the
14      belly, I wouldn't contribute that to
15      what's happening in the perimeter wall
```