# American Court Reporting
## toll-free (877) 320-1050

### Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

CIVIL ACTION NUMBER
1:06-CV-643-MHT

TERRY DEESE,
   Plaintiff(s),
vs.
CHAMPION ENTERPRISES, INC., et al.,
   Defendant(s).

DEPOSITION TESTIMONY OF:
ROBERT PARKS

February 19, 2007
9:10 a.m.

COURT REPORTER:
DEBORAH B. TOWNSEND, CSR

### Page 2

1        STIPULATION
2        IT IS STIPULATED AND AGREED by and
3  between the parties through their respective
4  counsel that the deposition of ROBERT PARKS, may
5  be taken before Deborah B. Townsend, Certified
6  Shorthand Reporter and Notary Public, State at
7  Large, at the offices of BEASLEY, ALLEN, CROW,
8  METHVIN, PORTIS & MILES, Montgomery, Alabama, on
9  February 19, 2007, commencing at approximately
10 9:10 a.m.
11       IT IS FURTHER STIPULATED AND
12 AGREED that the signature to and the reading of
13 the deposition by the witness is waived, the
14 deposition to have the same force and effect as
15 if full compliance had been had with all laws
16 and rules of Court relating to the taking of
17 depositions.
18       IT IS FURTHER STIPULATED AND
19 AGREED that it shall not be necessary for any
20 objections to be made by counsel to any
21 questions, except as to form or leading
22 questions, and that counsel for the parties may
23 make objections and assign grounds at the time

### Page 3

1  of trial or at the time said deposition is
2  offered in evidence, or prior thereto.
3        In accordance with Rule 5(d) of
4  the Alabama Rules of Civil Procedure, as
5  amended, effective May 15, 1988, I, Deborah B.
6  Townsend, am hereby delivering to Gregory S.
7  Ritchey the original transcript of the oral
8  testimony taken February 19, 2007, along with
9  exhibits.
10       Please be advised that this is the
11 same and not retained by the Court Reporter, nor
12 filed with the Court.
13
14
15
16           EXAMINATION INDEX
17
18 ROBERT PARKS
19    BY MR. RITCHEY       8
20
21
22
23

### Page 4

        EXHIBIT INDEX
               PAGE
Defendant's

| # | Description | Page |
|---|---|---|
| 1 | Notice of Deposition | 14 |
| 2 | Curriculum Vitae | 18 |
| 3 | Retainer Agreement and Invoices | 35 |
| 4 | List of Testimony | 39 |
| 5 | List of Retained Cases | 40 |
| 6 | List of Attorneys | 42 |
| 7 | Parks' Report on the Deese Home | 84 |
| 8 | Parks' File on the Deese Home | 102 |
| 9 | Data Collection Protocol | 105 |
| 10 | 8/10/05 Letter to HUD and Response | 126 |
| 11 | Tools Utilized | 137 |
| 12 | 8/10/05 Letter to HUD and Response | 174 |
| 13 | Correspondence Dealing with F-1-76 | 179 |
| 14 | Excerpt of Trial Testimony from Aucoin Case | 217 |
| 15 | Report from Aucoin Case | 219 |
| 16 | Indoor Air Quality Report | 297 |
| 17 | Mold Remediation Summary | 311 |
| 18 | Healthy Homes Report on FEMA Mobile Homes | 334 |

1 (Pages 1 to 4)

## www.AmericanCourtReporting.com
## February 19, 2007



**American Court Reporting**
**toll-free (877) 320-1050**

Page 173

1  is about (b)(1).
2  Q. (B)(1). This is (b)(2)?
3  A. (B)(2).
4  Q. And the first one is a Monday?
5  A. A what?
6  Q. I guess July -- Let's start with
7  the one that looks like it's dated Monday, July
8  24, 2006, which I'm going to mark as --
9  A. That would be the one under -- I
10 believe that's the one underneath. I believe
11 that one.
12 Q. Well --
13 A. Yes. That's referring to (b)(2)
14 and an interpretive bulletin, so that's the
15 second one.
16 Q. All right.
17 A. That's the last one, or one of the
18 last ones, I believe.
19 Q. Well -- Oh, I see what you're --
20 Okay. I'm looking at the wrong dates. Okay.
21 We're up to --
22 A. I've got 7. There's 10. There's
23 11.

Page 174

1  Q. Got 11.
2  A. I'm going to put those in the
3  stack. That's 7, 2 4 and 1 --
4  Q. Defendant's Exhibit 12, and is
5  this a letter, I believe, that you sent to HUD?
6  A. That's correct.
7  (WHEREUPON, Defendant's Exhibit
8  Number 12 was marked for identification and is
9  attached to the original transcript.)
10 Q. Was this the -- I guess the
11 answers are contained on the next page?
12 A. Yes.
13 Q. Okay.
14 A. Starts with, Mr. Parks, here is
15 the clarification you requested.
16 Q. Okay. Can I see that?
17 A. Sure.
18 Q. And specifically, I guess the
19 question to you was clarify the need for having
20 four choices. Is that --
21 A. Well, there was three different
22 questions.
23 Q. Okay. And this was question two?

Page 175

1  A. Uh-huh.
2  Q. And then the second one is the --
3  well, the third one is a question on separate
4  correspondence. Is that what --
5  A. Correct.
6  Q. Okay. The first two questions, do
7  those relate to another e-mail or to --
8  A. They're -- they're right there.
9  Q. Okay.
10 A. They're all stapled together.
11 Q. All right. So the first one is
12 the August 10th, and then you sent -- okay --
13 two --
14 A. Uh-huh.
15 Q. -- two letters?
16 A. Uh-huh.
17 Q. Okay. And it appears that they --
18 with regard to your request for whether or not
19 HUD considered the application of 504(b)(1) as a
20 reasonable application of homes in the Thermal 1
21 Zone --
22 A. Uh-huh.
23 Q. -- HUD did not have a problem with

Page 176

1  the use of (b)(1) walls in Thermal 1 Zone,
2  correct?
3  A. I don't -- I can't say that they
4  didn't have a problem with the use. What they
5  stated was that there was no geographic
6  specificity --
7  Q. Correct.
8  A. -- to where -- But then again,
9  they put it back to the -- that it was the
10 manufacturer's responsibility to make the
11 appropriate option.
12 Q. Well, didn't they also say -- and
13 I'll just quote it for you -- the department
14 does not have data, research, or other
15 information that would substantiate restricting
16 the use of alternative condensation control
17 method written in the Manufactured Home
18 Construction and Safety Standards as codified in
19 3280.504(b)(1) to only Thermal Zones 2 and 3.
20 A. Correct.
21 Q. Okay. And it also, if I'm reading
22 this correctly, suggested to you that if you
23 have anything or would like to propose a

44 (Pages 173 to 176)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 177

1   standard, that you can write -- you could
2   provide a proposed standard change to the
3   administration -- administering organization of
4   the Manufactured Housing Consensus Committee,
5   right?
6       A.   Right. And I -- I interpreted
7   that to mean that simply that no one has taken
8   the steps to present that kind of documentation
9   to HUD to make that restriction of one.
10      Q.   Have you ever done that?
11      A.   No, I haven't.
12      Q.   So you -- even though back in
13  August -- apparently, August of 2005, they asked
14  you if -- if you felt -- felt like you had a
15  problem, to present something to the consensus
16  committee, you've not done that?
17      A.   I have not done that yet.
18      Q.   The -- the department also said
19  that they did not have the sufficient data,
20  research, or other information that would
21  substantiate restricting the use of the
22  alternative construction control -- condensation
23  control method in 504(b)(1).

Page 178

1   Did you provide any data, research, or
2   other information to HUD?
3       A.   Okay. I think we just answered
4   that. That -- when I -- You asked me have I
5   provided, and I said no, I haven't. Now you're
6   asking the same exact question again.
7       Q.   Well, I'm just asking if you
8   had -- if you provided any data, research, or
9   other information.
10      A.   That's the same question you asked
11  a minute ago, and no, sir, I haven't.
12      Q.   No. I -- The question I meant to
13  ask a second ago was whether or not you proposed
14  a standard change to HUD?
15      A.   Oh. Well, no, I haven't proposed
16  a standard change.
17      Q.   So it's --
18      A.   That letter --
19      Q.   -- it's -- I guess --
20      A.   May I finish?
21  I have not proposed a standard change.
22      Q.   Okay.
23      A.   And that wasn't the intent of me

Page 179

1   writing those questions. I consult with
2   manufacturers, and during that point in time, I
3   was trying to go directly to HUD to provide some
4   information to my client to show that they did
5   have an option as to which choices to choose,
6   and that option one was not force placed upon
7   them, except maybe by their DAPIA.
8       Q.   The Defendant's Exhibit 13 deals
9   with, I guess, interpretive bulletin F-1-76?
10              (WHEREUPON, Defendant's Exhibit
11  Number 13 was marked for identification and is
12  attached to the original transcript.)
13      A.   That's correct.
14      Q.   Okay.
15      A.   And my intent there was to show
16  that a vapor barrier could, in fact, be placed
17  on the exterior side of the home already without
18  having to utilize the waiver, using option two
19  and that interpretive bulletin, of which the
20  final comment was he agreed with my
21  interpretation.
22      Q.   And that is in Defendant's Exhibit
23  13 or --

Page 180

1       A.   The one you just put down. That
2   one, 13, yes. The final e-mail from him stated
3   that he agreed with my interpretation.
4       Q.   Okay. And that's basically your
5   interpretation, that you can have -- use a -- a
6   (b)(2) wall in a southern climate. Is that what
7   you're asking?
8       A.   (B)(2) would be a more appropriate
9   standard to start with, but you could utilize
10  that waiver and even acquire permission to
11  install a vapor barrier on the exterior. By --
12  Or not waiver, I'm sorry. The interpretive
13  bulletin, because that interpretive bulletin
14  specifically applies to (b) -- option (b)(2).
15      Q.   Okay. Where does it say that
16  the -- this interpretive bulletin specifically
17  applies to option (b)(2)?
18      A.   That is interpretive bulletin on
19  condensation control in the manual right there
20  for 3280.504(b)(2).
21      Q.   Okay.
22      A.   That interpretive bulletin was
23  specifically meant for (b)(2). Or that's my

45 (Pages 177 to 180)

**www.AmericanCourtReporting.com**
**February 19, 2007**

American Court Reporting
toll-free (877) 320-1050

Page 181

1  interpretation of what they wrote there.
2     Q.   Does it say (b)(2) here?  Is
3  that --
4     A.   Yeah.  It's highlighted in blue.
5     Q.   Okay.  504(b)(2).
6     A.   Yeah.
7     Q.   Okay.  Okay.
8          MR. GOULD:  For the record,
9  what section and what page?  Where did you find
10 that?
11    A.   This is part 3280 of the
12 Manufactured Housing Construction and Safety
13 Standard in the interpretive bulletin section,
14 page eight, middle paragraph.
15    Q.   Now, wasn't that interpretive
16 bulletin clarified in one of the federal
17 registers later?
18    A.   I'm not sure.
19    Q.   Well, would it not be true that
20 that reference to interpretive bulletin was only
21 intended for cold climates in (b)(2)?
22    A.   According to HUD, they don't have
23 geographic specificity to any of their stand --

Page 182

1  to the wall construction standards.
2     Q.   Okay.  But did they not state in
3  the federal register --
4     A.   In -- I'm sorry.
5     Q.   Did they not state in the federal
6  register that (b)(2) was only intended for cold
7  climates?
8     A.   Well, I think it went on to state
9  that (b)(2) applied.  And -- and this was in the
10 moisture waiver itself.  And it said (b)(2) was
11 applicable to -- or the interpretive bulletin
12 was applicable to (b)(2) and not (b)(1), and
13 that (b)(1) was the subject of that waiver.  And
14 it may have mentioned something about cold
15 climate, but I have yet to find anything, nor
16 has HUD been able to produce anything, that says
17 that that is for a cold climate or to be
18 interpreted.  In fact, the structural engineer
19 for HUD agreed with my interpretation that it
20 could, in fact, be utilized.
21    Q.   Do you believe that any of these
22 e-mails or letters or anything else you received
23 from HUD in any way changes the HUD code?

Page 183

1     A.   No.  But I -- The HUD code is
2  already in place and more than sufficient to
3  build a home that will perform.
4     Q.   Okay.
5     A.   Option two doesn't need the waiver
6  to build the house that will perform in the Gulf
7  Coast.  It specifically -- it -- it's -- the
8  specificity to it is already more than
9  sufficient.
10    Q.   Now, have you ever petitioned HUD
11 to do any investigation of the 3282.156 as to
12 any non-compliance, defect, or any other problem
13 with interior vapor barriers?
14    A.   My -- my clients are with
15 manufactured home builders, not -- I have not
16 petitioned HUD.
17    Q.   Well, do you feel like there --
18 there are more homes out there than just one
19 that has vinyl interior vapor barriers on the
20 interior side of the house that's causing a
21 problem?
22    A.   I think there are thousands of
23 them.

Page 184

1     Q.   Well, if you are a contractor for
2  an SAA, do you not have an obligation to
3  petition HUD?
4     A.   No.  My obligation is to the SAA
5  that I'm working for, and I've made him very
6  well aware of this for years.  But it is their
7  option as to how they use the information that I
8  provide to them.
9     Q.   So you disagree that you have an
10 obligation to do that under the HUD code?
11    A.   My obligation at -- was to the
12 SAA's I was working for.  You asked me as a
13 consultant for the SAA, did I have an obligation
14 to petition HUD.  And no, sir, I disagree.
15    Q.   Okay.  Well, would you -- would
16 you agree that the HUD code is based on
17 generally-accepted engineering practices?
18    A.   I would.
19    Q.   And if it's good enough to be in
20 the code, it's good enough to be followed?
21    A.   If it's applied properly, yes,
22 sir.
23    Q.   Okay.

46 (Pages 181 to 184)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 185

1   A.   It's when the standards are
2  misapplied that they become problematic.
3   Q.   Do you have any formal education
4  in mycology?
5   A.   No, sir.
6   Q.   Do you have any formal education
7  in bacteriology?
8   A.   No, sir.
9   Q.   Do you have any formal education
10 in toxicology?
11   A.   No, sir.
12   Q.   Do you intend to give any opinion
13 as to whether or not the mold you found, if you
14 did find some mold in this house, is in any way
15 viable?
16   A.   No, sir.
17   Q.   Do you intend to give any opinions
18 regarding the health effects associated with
19 being exposed to any mold that you may have
20 found in this house?
21   A.   No, sir.
22   Q.   Have you instructed the homeowner
23 to move out of the house?

Page 186

1   A.   No, sir.
2   Q.   Have you given any type --
3   A.   I'm sorry.
4   Q.   -- health-related instructions to
5  the homeowner with regard to anything you found?
6   A.   No, sir.
7   Q.   Now, are you contending that the
8  manufacturers violated any type of a code
9  standard in the design of this house?
10   A.   I believe they have
11 misappropriated the proper standard for
12 utilizing in this house. I -- To be quite
13 frank, based on this -- the Deese home, I can't
14 really tell which standard they're utilizing,
15 because they have combined two separate wall
16 standards. They have what appears to be vinyl-
17 covered wallboard, which is a vapor barrier on
18 the living side, and it's also a fully-
19 ventilated wall cavity. So I am not able to
20 tell what their intent was. But I do know that
21 it's condensating and collecting moisture within
22 the wall cavity.
23   Q.   Well --

Page 187

1   A.   And since 504 is entitled
2  condensation control, unless there was intent --
3  their intent was to control condensation and
4  make it form on the wallboard, then I don't
5  believe it's forming as designed.
6   Q.   Well, isn't it true that materials
7  in homes do get wet on occasion and dry --
8   A.   It's possible.
9   Q.   -- in any house?
10 In fact, it's assumed that you're going
11 to have some wetting and drying during the life
12 of a house?
13   A.   In different areas and different
14 portions of the home, sure.
15   Q.   And it's assumed that you're going
16 to have that mostly in the hot, humid climates
17 during the summer months?
18   A.   No, sir. I would -- Not -- not
19 within the gypsum wall cavity and the exterior
20 wall. That is not a normal, assumable
21 application.
22   Q.   Okay. So you're saying that it's
23 not assumed that walls will have periods of

Page 188

1  wetting and drying during the -- a typical year?
2   A.   It could have short periods of
3  wetting and drying, but it will -- it should not
4  be wet for four to five months out of the year
5  and cause structural deterioration and mold
6  growth.
7   Q.   Okay. And how long has the Deese
8  house been in the field?
9   A.   I'm not sure. I'd have to look at
10 my chart.
11   Q.   Okay. The -- Do you know when
12 this house was purchased and installed?
13   A.   I believe I have that in the lab
14 book, but I don't know that I have it in my
15 report. No, sir. I don't have that information
16 in my report, but I believe it is in my lab
17 book.
18   Q.   You don't have -- what -- what
19 lab --
20   A.   It's --
21   Q.   This right here?
22   A.   No. Is that it underneath your --
23 that copy of the report right there?

47 (Pages 185 to 188)

**www.AmericanCourtReporting.com**
**February 19, 2007**