IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA,
NORTHERN DIVISION

| | |
|---|---|
| HAROLD KELLY MURPHY, | ) |
| Plaintiff. | ) ) ) |
| v. | ) ) Case No.: 2:06-cv-618-MEF |
| SOUTHERN ENERGY HOMES, INC., et al., | ) ) ) ) |
| Defendants. | ) |

### DECLARATION OF KEITH E. LEESE, REHS, IEP, WLR

1. My name is Keith Leese. I am over the age of eighteen years and make this declaration based upon my personal knowledge.

2. I am a practicing environmental scientist and a qualified Indoor Environmental Professional with approximately 28 years experience. My curriculum vitae is attached as Exhibit 1.

3. I was contacted in November 2007 by Scott Simpson to assist him in preparing a fungal and moisture evaluation of the Murphy residence at 5489 Washington Ferry Road, Montgomery, Alabama. I was also asked to review the deposition, conclusions and reports of Bobby Parks. I have prepared a written report of my findings, a copy of which is attached as Exhibit 2.

4. Based on a thorough inspection of the property and a careful review of the investigation and conclusions of Mr. Parks, it is my professional opinion, to a reasonable degree of scientific certainty, that Parks is unqualified to evaluate and interpret mold sampling data, that Parks failed to meet the standard of care in the performance of his investigation, and that Parks' conclusions are not based on sufficient data or sound scientific principles.

5. First, Parks does not appear to have the requisite qualifications to interpret mold sampling data. He has no college education, no formal training in biology or the environmental


EXHIBIT G

sciences, little or no training in the interpretation of mold sampling data, and while he appears to hold a mold remediation license from the state of Louisiana, he has never even performed a single mold remediation. Furthermore, in his deposition, Parks displays a fundamental lack of knowledge and familiarity with basic terminology and concepts in the mold remediation and evaluation field.

6. The IICRC S-520 Standard and Reference Guide for Professional Mold Remediation ("S520") is accepted by the scientific community as a primary authority for industry standards in the field of mold evaluation and remediation of indoor environments. Professionals performing fungal evaluations in buildings should be familiar with these industry standards and their terminology and recommended procedures.

7. Indoor Environmental Professional ("IEP") is a common designation in the industry used to refer to individuals qualified to perform an assessment of the fungal ecology of a building, conduct mold sampling, interpret lab data, and determine the magnitude of any mold problems that are found. Parks states in deposition that he has never heard the term and does not know what an IEP is. Parks also states in deposition that he is not familiar with such basic fungal ecology concepts as normal fungal ecology, primary, secondary, and tertiary fungal colonizers, or Condition 1, Condition 2, and Condition 3, which are defined in the S520 and are used as industry standards to describe the level of fungal contamination found in an indoor environment. Parks' lack of knowledge of these basic concepts of mold investigations strongly indicates that he is unqualified to be performing such investigations.

8. According to the S520, IEPs are qualified to interpret laboratory data on the mold samples taken in the course of a fungal ecology assessment, but mold remediators are not. Because Parks is not an IEP, he is not qualified to interpret mold laboratory data.

9. In addition to Parks' lack of qualifications, the methodology he used in the investigation is not based on sound scientific principles or industry standards.

10. Parks attempts to use the presence of mold within certain portions of the wall cavity to prove defects in the structural integrity of the walls themselves. There are several problems with this approach. First, it is not considered unusual to find fungal spores in a wall cavity, and there are no industry standards for what constitutes an acceptable level of fungal spore counts in a wall cavity of a building. Second, the standards referenced by Parks in his report as evidence of "high" levels of mold – the Baxter/ETS and National Allergy Bureau standards – are not standards for microenvironments like wall cavities, but are instead designed for indoor occupant spaces and outdoor air environments, respectively. Parks application of these "standards" to wall cavity air samples is misleading and unreliable.

11. Regardless of the magnitude of the mold spore count that is found in a given area, interpreting such results requires the consideration of other data such as the observation and testing of the physical condition of the materials being sampled. Parks failed to properly take into account the actual condition of the gypsum wallboard at issue, which turned out after testing to significantly exceed industry performance standards. Without accounting for these critical variables, Parks' conclusions are invalid.

12. In general, Parks' wall cavity sampling methodology lacks scientifically valid standards and procedures. It has never been peer reviewed for validity. There is no randomized objective sample selection. The sample selection methodology appears to have been made up by Parks, and any interpretation of the results must be performed as part of a proper scientific investigation to determine its reliability.

13. Parks ultimately attempts to interpret the data from his unsubstantiated mold sampling methodology to prove that an unacceptable level of moisture has entered the walls as a result of the interior vapor barrier. However, Parks does not consider, much less rule out, alternate sources of moisture such as roof leaks or bulk water leaks, both of which the Plaintiff admits occurred. Parks also fails to consider the impact that high mold levels in the crawlspace might have on his sampling results. Indeed, he never even entered the crawlspace to investigate it as a possible source of fungal contamination. These methodological errors are fatal flaws in Parks' investigation that render his results unreliable and scientifically invalid.

14. In addition to Parks' lack of qualifications and his unreliable methodology, his evidence does not logically support the conclusions he draws. Instead, Parks asserts without justification that the presence of mold in the wall cavity proves that the walls themselves are already or will eventually become structurally unsound. However, the presence of mold by itself does not prove that moisture is currently present, and it does not necessarily mean the walls will deteriorate in the future. It only shows that mold spores are present, but their source is unknown and can only be determined by a proper scientific investigation. Indeed, Parks does not even know how to tell the difference between active mold and dormant mold. Consequently, he has no way of showing that even if there is evidence of mold in the wall cavity, that it was the result of a one-time bulk water leak or of frequent condensation within the wall cavity.

15. Had Parks conducted a thorough and proper investigation using scientifically reliable methods, he would have found only one room in the house, the master bathroom, with potentially problematic mold contamination in the gypsum wallboard. He would also have found, had he investigated alternative sources of moisture, that the most likely explanation

for the condition of the bathroom walls is the bulk water leak behind the master bathroom sink that the homeowners described in their deposition.

16. In short, to a reasonable degree of scientific certainty, it is my opinion that Parks is unqualified to offer any opinions that relate to the interpretation of mold data, his methodology lacks scientific validity and reliability, and his conclusions are unsupported by his data.

I declare under penalty of perjury that the information contained in this declaration is true and correct to the best of my knowledge.

Executed on this the 6th day of February 2008.

_____
Keith E. Leese